**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1209

---

In the

# United States Court of Appeals
## for the District of Columbia Circuit

---

NORFOLK SOUTHERN RAILWAY CO.,

*Petitioner,*

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,

*Respondents,*

CSX TRANSPORTATION, INC.,

*Intervenor.*

---

On Petition for Review of a Decision of the
Surface Transportation Board

---

**OPENING BRIEF FOR NORFOLK SOUTHERN RAILWAY CO.**

---

William A. Mullins
Crystal M. Zorbaugh
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
 Ste. 300
Washington, DC 20037

Shay Dvoretzky
 *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
Hanaa Khan
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioner Norfolk Southern Railway Co.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rules 26.1 and 28(a)(1) and Federal Rule of Appellate Procedure 26.1, Petitioner Norfolk Southern Railway Company hereby submits its Certificate as to Parties, Rulings, and Related Cases.

### I.    Parties

The parties to this proceeding are as follows:

### A.    Petitioner Norfolk Southern Railway Co.

Petitioner Norfolk Southern is wholly owned by the publicly held corporation Norfolk Southern Corporation. No publicly held corporation holds 10% or more of Norfolk Southern Corporation's stock, which is traded on the New York Stock Exchange under the symbol NSC. Norfolk Southern is a Class 1 railroad operating in the eastern United States. As relevant here, Norfolk Southern transports containers to and from East Coast ports, where ships carry them in interstate and international commerce.

### B.    Respondents Surface Transportation Board and the United States of America

Respondents are the Surface Transportation Board and the United States of America.

### C.    Intervenors

Intervenor is CSX Transportation, Inc.

### D.    Parties Below

The parties to the STB proceeding below are:

- Norfolk Southern

- Norfolk & Portsmouth Belt Line Railroad Company (Belt Line)

- CSX

## II.    Rulings Under Review

Norfolk Southern seeks review of the STB decision captioned *Norfolk Southern Railway Company – Petition for Declaratory Order*, STB No. FD 36522, Decision, 2022 WL 2191932 (June 17, 2022).

## III.    Related Cases

- *CSX Transportation, Inc. v. Norfolk Southern Railway Co.*, No. 2:18-cv-00530 (E.D. Va.)

- *Norfolk Southern Railway Co. v. STB*, No. 2:22-cv-00385 (E.D. Va.)

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Norfolk Southern hereby discloses that:

(a)    Norfolk Southern is wholly owned by the publicly held corporation Norfolk Southern Corporation. No publicly held corporation holds 10% or more of Norfolk Southern Corporation's stock, which is traded on the New York Stock Exchange under the symbol NSC.

(b)    Norfolk Southern is a Class 1 railroad operating in the eastern United States. As relevant to this proceeding, Norfolk Southern transports containers to and from East Coast ports, where ships carry them in interstate and international commerce.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..........i

DISCLOSURE STATEMENT...............................................................iii

TABLE OF AUTHORITIES.............................................................viii

GLOSSARY ....................................................................................... xv

REQUEST FOR ORAL ARGUMENT............................................... xvii

INTRODUCTION ...............................................................................1

STATEMENT OF ISSUES ...................................................................5

PERTINENT STATUTES AND REGULATIONS................................6

STATEMENT OF THE CASE...............................................................6

    A.    Legal background.....................................................................6

        1.    The STB reviews proposed transactions between rail carriers to promote railroad consolidation and efficient interstate rail transportation. ..................................6

        2.    The ICA and its implementing regulations provide two tracks for approving transactions and thus conferring antitrust immunity: formal approval and summary exemption procedures...........................................7

        3.    The courts of appeals have exclusive jurisdiction to review most STB decisions. ....................................9

    B.    Factual and procedural background ...........................................11

        1.    Between Belt Line's 1896 establishment and the 1980s, railroad consolidations concentrate holdings of Belt Line shares between Norfolk Southern and CSX's families. ........................................................12

# TABLE OF CONTENTS
## (continued)

**Page**

  2. In 1991, the ICC grants a corporate family exemption that created Norfolk Southern..........................14

  3. In 1998, the STB approves further consolidation of Norfolk Southern. ..................................................16

  4. CSX sues Norfolk Southern and Belt Line and the district court asks the STB whether the 1982 consolidation authorized Norfolk Southern to control Belt Line. ..................................................17

  5. The STB determines that the ICC did not authorize Norfolk Southern to control Belt Line in the 1982 consolidation and further concludes that the 1991 and 1998 exemptions did not authorize control either..........................................................................19

  6. Norfolk Southern petitions this Court and files a protective complaint before the district court. .................21

SUMMARY OF ARGUMENT ...................................................22

STANDING....................................................................27

ARGUMENT....................................................................28

I. This Court has jurisdiction to consider Norfolk Southern's petition for review. .....................................................28

  A. This Court has jurisdiction over Norfolk Southern's claims under the Hobbs Act. .........................................28

   1. The courts of appeals review all issues other than those expressly set out in the district court's referral order. .......................................................28

# TABLE OF CONTENTS
## (continued)

Page

  2. This Court has jurisdiction over Norfolk Southern's challenge to the STB's rulings on the 1991 and 1998 issues not referred by the district court. ............................30

 B. The government and CSX's counterarguments lack merit. .......33

  1. Attempts to distinguish *McCarty* ignore this Court's clear, "bright line rule." ..........................................................33

  2. The notion that the district court referred the 1991 and 1998 issues is wrong.........................................................36

  3. The government and CSX mistake the scope of the agency proceedings for the scope of the referral. .............40

  4. The government's policy argument fails.............................41

II. The STB's rulings as to the 1991 and 1998 corporate-family exemptions violate the Administrative Procedure Act.........................42

 A. STB rulings must comply with the APA.......................................42

  1. An agency acts arbitrary and capriciously when it relies on an interpretation of a regulation inconsistent with the regulation's plain text......................43

  2. The APA also requires a reasoned explanation for agency action. ........................................................................47

 B. The STB's ruling on the 1991 and 1998 exemptions is arbitrary and capricious because it rests on a rule that is inconsistent with the regulation the STB purported to apply.................................................................................................49

  1. The STB's interpretation of the corporate-family exemption is inconsistent with the text and structure of the regulation. ....................................................50

# TABLE OF CONTENTS
(continued)

**Page**

      2.      The STB's justifications lack merit, and its interpretation of the corporate-family-exemption regulation is not entitled to deference. ...............................55

   C.     The STB's rulings on the 1991 and 1998 corporate-family exemptions are arbitrary and capricious because the Board did not supply a reasoned explanation for its decisions...........................................................................58

   D.     The Court should vacate and remand for the STB to reconsider its rulings on the 1991 and 1998 corporate-family exemptions. ........................................................60

CONCLUSION ....................................................................................64

CERTIFICATE OF COMPLIANCE ...................................................65

CERTIFICATE OF SERVICE .............................................................66

INDEX OF ADDENDUM ...................................................................68

ADDENDUM........................................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akzo Nobel Salt, Inc. v. Federal Mine*
   *Safety & Health Review Commission,*
   212 F.3d 1301 (D.C. Cir. 2000) ......................................................... 60

*Alhambra Hospital v. Thompson,*
   259 F.3d 1071 (9th Cir. 2001) ............................................................ 46

*Auer v. Robbins,*
   519 U.S. 452 (1997) ..................................................................... 45, 46

*Beazer East, Inc. v. United States*
   *Environmental Protection Agency,*
   963 F.2d 603 (3d Cir. 1992) ............................................................... 44

*Bowen v. Georgetown University Hospital,*
   488 U.S. 204 (1988) .............................................................. 47, 57, 58

*Bowles v. Seminole Rock & Sand Co.,*
   325 U.S. 410 (1945) ..................................................................... 43, 50

*Brotherhood of Locomotive Engineers v. United States,*
   101 F.3d 718 (D.C. Cir. 1996) ........................................................... 28

*Burlington Northern & Santa Fe Railway Co. v.*
   *Surface Transportation Board,*
   403 F.3d 771 (D.C. Cir. 2005) ..................................................... 27, 28

*Carlson v. Postal Regulatory Commission,*
   938 F.3d 337 (D.C. Cir. 2019) ..................................................... 48, 60

*Christensen v. Harris County,*
   529 U.S. 576 (2000) ........................................................................... 44

*Citizens for Responsibility & Ethics in Washington v.*
   *Federal Election Commission,*
   993 F.3d 880 (D.C. Cir. 2021) ........................................................... 51

*Coeur Alaska, Inc. v. Southeast Alaska*
   *Conservation Council,*
   557 U.S. 261 (2009) ........................................................................... 45

# TABLE OF AUTHORITIES
(continued)

Page(s)

*CSL Plasma Inc. v. U.S. Customs
and Border Protection*,
33 F.4th 584 (D.C. Cir. 2022) ............................................................28

*Department of Commerce v. New York*,
139 S. Ct. 2551 (2019) ........................................................... 47, 48

*Eagle Pharmaceuticals, Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020) ..........................................................45

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ..........................................................................47

*Fisher v. Pension Benefit Guaranty Corp.*,
994 F.3d 664 (D.C. Cir. 2021) ..........................................................61

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ..........................................................................47

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ..................................................................... 45, 46

*Green v. Brennan*,
578 U.S. 547 (2016) ..................................................................... 25, 44

*Hispanic Affairs Project v. Acosta*,
901 F.3d 378 (D.C. Cir. 2018) ..........................................................44

*Huashan Zhang v. United States
Citizenship and Immigration Services*,
978 F.3d 1314 (D.C. Cir. 2020) ........................................................46

*Jost v. Surface Transportation Board*,
194 F.3d 79 (D.C. Cir. 1999) ................................................ 47, 48, 49, 61

*Kessler v. Surface Transportation Board*,
635 F.3d 1 (D.C. Cir. 2011) ................................................................8

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ...................................................... 26, 44, 46, 56, 57

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Landstar Express America, Inc. v.*
  *Federal Maritime Commission*,
  569 F.3d 493 (D.C. Cir. 2009)............................................................. 45, 55, 56

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)...........................................................................27

*Manufacturers Railway Co. v.*
  *Surface Transportation Board*,
  676 F.3d 1094 (D.C. Cir. 2012)..........................................................48

*Massachusetts v. Environmental Protection Agency*,
  549 U.S. 497 (2007)...........................................................................48

*McCarty Farms, Inc. v.*
  *Surface Transportation Board*,
  158 F.3d 1294 (D.C. Cir. 1998)..........................3, 5, 10, 23, 24, 29, 30, 31, 32,
  ................................................................33, 34, 35, 36, 37, 38, 39, 40, 41,

*Michigan v. Environmental Protection Agency*,
  576 U.S. 743 (2015).......................................................................... 25, 47

*Motor Vehicle Manufacturers Ass'n v. State Farm*
  *Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983).......................................................................... 60, 61

*Mozilla Corp. v. Federal Communications Commission*,
  940 F.3d 1 (D.C. Cir. 2019)...............................................................59

*Nader v. Nuclear Regulatory Commission*,
  513 F.2d 1045 (D.C. Cir. 1975)..........................................................63

*National Lifeline Ass'n v.*
  *Federal Communications Commission*,
  983 F.3d 498 (D.C. Cir. 2020)...........................................................56

*National Mining Ass'n v.*
  *United States Department of the Interior*,
  177 F.3d 1 (D.C. Cir. 1999)...............................................................58

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Northern Air Cargo v. United States Postal Service*,
674 F.3d 852 (D.C. Cir. 2012) ............................................................... 61

*Railroad Salvage & Restoration, Inc. v.*
*Surface Transportation Board*,
648 F.3d 915 (8th Cir. 2011) ................................................................. 34

*Railway Labor Executives Ass'n v.*
*Interstate Commerce Commission*,
894 F.2d 915 (7th Cir. 1990) ................................................................. 41

*Riffin v. Surface Transportation Board*,
592 F.3d 195 (D.C. Cir. 2010) ............................................................... 43

*Rock of Ages Corp. v. Secretary of Labor*,
170 F.3d 148 (2d Cir. 1999) .................................................................. 58

*Securities Exchange Commission v. Chenery Corp.*,
332 U.S. 194 (1947) ............................................................................. 48

*Shady Grove Orthopedic Associates, P.A. v.*
*Allstate Insurance Co.*,
559 U.S. 393 (2010) ............................................................................. 45

*Shalala v. St. Paul-Ramsey Medical Center*,
50 F.3d 522 (8th Cir. 1995) ................................................................... 44

*Shepherd v. Merit Systems Protection Board*,
652 F.2d 1040 (D.C. Cir. 1981) ...................................................... 43, 44

*Snohomish County v. Surface Transportation Board*,
954 F.3d 290 (D.C. Cir. 2020) .................................... 8, 9, 24, 25, 55

*St. Helena Clear Lake Hospital v. Becerra*,
30 F.4th 301 (D.C. Cir. 2022) ............................................................... 45

*Thomas Jefferson University v. Shalala*,
512 U.S. 504 (1994) ............................................................................. 43

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996) ................................................................ 45

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Union National Bank of Pittsburgh v.*
  *Interstate Commerce Commission,*
  569 F.2d 742 (3d Cir. 1977) ................................................. 48, 49

*Union Pacific Railroad Co. v. Ametek, Inc.,*
  104 F.3d 558 (3d Cir. 1997) ........................................ 30, 34, 35, 38

*United States v. AMC Entertainment, Inc.,*
  549 F.3d 760 (9th Cir. 2008) ......................................................58

*United States v. Tohono O'Odham Nation,*
  563 U.S. 307 (2011) ...................................................................45

*United Transportation Union v. Burlington*
  *Northern Santa Fe Railroad Co.,*
  528 F.3d 674 (9th Cir. 2008) .........................................................6

**STATUTES**

5 U.S.C. § 551(4) ...........................................................................57

5 U.S.C. § 554(e) ...........................................................................40

5 U.S.C. § 702 ................................................................................27

5 U.S.C. § 706(2)(A) ...................................................... 4, 24, 42, 43, 47

28 U.S.C. § 1336(b)........................... 3, 5, 10, 29, 30, 33, 35, 39, 41

28 U.S.C. § 2321(a) ................................................. 3, 5, 10, 29

28 U.S.C. § 2342(5) ................................................ 3, 5, 10, 27, 29

28 U.S.C. § 2344 .......................................................... 27, 28

49 U.S.C. § 1321 ...........................................................................40

Interstate Commerce Act of 1887, 49 U.S.C. § 10101 *et seq.*.........................6, 54

  49 U.S.C. § 10102(3)......................................................................6

  49 U.S.C. § 10502 .......................................................................54

  49 U.S.C. § 10502(a) ................................................................7, 8

  49 U.S.C. § 10502(d) ..................................................................54

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

49 U.S.C. § 11321(a) ................................................................ 2, 7, 27

49 U.S.C. § 11323(a) ....................................................................6, 28

49 U.S.C. § 11323(a)(1) ....................................................................6

49 U.S.C. § 11323(a)(3) ....................................................................6

49 U.S.C. § 11323(b) ....................................................................6

49 U.S.C. § 11325 ....................................................................7

**REGULATIONS**

49 C.F.R. § 1117.1 ....................................................................39

49 C.F.R. § 1180.2(d) ....................................................................9

49 C.F.R. § 1180.2(d)(1) ....................................................................54

49 C.F.R. § 1180.2(d)(3) .................................... 2, 9, 25, 49, 50, 51, 52, 62

49 C.F.R. § 1180.4(c) ....................................................................7

49 C.F.R. § 1180.4(d) ....................................................................7

49 C.F.R. § 1180.4(g)(iii) ....................................................................53

49 C.F.R. § 1180.4(g)(v) ....................................................................53

**OTHER AUTHORITIES**

*49 CFR Part 1180: Railroad Consolidation Procedures:*
  *Class Exemption For Transactions*
  *Within A Corporate Family,*
  1993 WL 17884 (Jan. 19, 1993) ................................................ 52, 53

*Black's Law Dictionary* (5th ed. 1979) ....................................................29

*BNSF Railway Co. – Temporary Trackage Rights*
  *Exemption – Union Pacific Railroad Co.,*
  STB No. FD 35963, 2015 WL 9241562 (Dec. 11, 2015)....................................54

*CSX Corp. – Control – Chessie Sys., Inc.,*
  *and Seaboard Coast Line Indus., Inc.,*
  366 I.C.C. 521, 1980 WL 14204 (Sept. 23, 1980)............................................13

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Delaware & Hudson Railway Co.—Lease & Trackage Rights*
  *Exemption—Springfield Terminal Railway Co.*,
  4 I.C.C.2d 322 (Feb. 17, 1988) ............................................................53

*Merger—The Baltimore & Ohio Railroad Co. &*
  *The Chesapeake & Ohio Railway Co.*,
  ICC No. FD 31035, 1988 WL 225928 (Feb. 22, 1988) ......................53

*Norfolk Southern Railway Company; Merger Exemption;*
  *Norfolk and Western Railway Company*,
  63 Fed. Reg. 46278-01, 1998 WL 546005 (Aug. 31, 1998)...................... 16, 17

*Railroad Consolidation Procedures: Class Exemption*
  *for Transactions Within a Corporate Family*,
  57 Fed. Reg. 34891-02, 1992 WL 187987 (Aug. 7, 1992)................................52

*South Plains Switching, Ltd.—Acquisition Exemption*
  *BNSF Railway Co.*, STB No. FD 33753,
  2006 WL 2644250 (Sept. 14, 2006)....................................................54

*Southern Railway Co.—Control Exemption—Norfolk and Western*
  *Railway Co. Chesapeake Western Railway, the Toledo Belt Railway Co.,*
  *and Wabash Railroad Co.; Exemption*,
  56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991)..................................15

*The 35th Anniversary of the Staggers Rail Act: Railroad Deregulation Past,*
  *Present, and Future: Hearing Before the Subcomm. on Railroads, Pipelines, &*
  *Hazardous Materials of the H. Comm. on Transportation & Infrastructure*,
  114th Cong. 1 (2015), https://tinyurl.com/hxyzwckr.................................8

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Belt Line | Norfolk & Portsmouth Belt Line Railway Company |
| Belt Line STB Opening | Opening Statement and Evidence of Norfolk and Portsmouth Belt Line Railroad Company, STB No. FD 36522 (Sept. 23, 2021) (JA__-__) |
| Chesapeake | Chesapeake and Ohio Railway Company |
| CSX | CSX Transportation, Inc. |
| CSX STB Opening | CSXT's Opening Statement, STB No. FD 36522 (Sept. 23, 2021) (JA__-__) |
| Decision | *Norfolk Southern Railway Company – Petition for Declaratory Order*, STB No. FD 36522, Decision, 2022 WL 2191932 (June 17, 2022) |
| ICA | Interstate Commerce Act |
| ICC | Interstate Commerce Commission |
| Norfolk Southern | Norfolk Southern Railway Company |
| Norfolk Southern STB Opening | Norfolk Southern Railway Company – Opening Statement, STB No. FD 36522 (Sept. 23, 2021) (JA__-__) |
| Norfolk Southern STB Reply | Norfolk Southern Railway Company's Reply to CSXT's Opening Statement, STB No. FD 36522 (Oct. 25, 2021) (JA__-__) |
| Norfolk and Western | Norfolk and Western Railway Company |
| NSC | Norfolk Southern Corporation |

| Pet. Order | *Norfolk Southern Railway Company – Petition for Declaratory Order*, Decision, STB No. FD 36522 (Aug. 9, 2021) |
| --- | --- |
| Seaboard | Seaboard Coast Line Railroad Company |
| Southern | Southern Railway Company |
| STB or Board | Surface Transportation Board |

## REQUEST FOR ORAL ARGUMENT

The Court's December 15, 2022, order states that "[t]he Clerk is directed to calendar this case for oral argument on the first appropriate date following the completion of briefing." Norfolk Southern looks forward to the opportunity to aid the Court in its decisionmaking process at oral argument.

# INTRODUCTION

This case is about the Surface Transportation Board's arbitrary and capricious refusal to recognize what has been true for decades: that Petitioner Norfolk Southern Railway Company has the power to control the Norfolk & Portsmouth Belt Line Railroad Company (Belt Line) through a majority of Belt Line's shares, and that the Interstate Commerce Commission (ICC) in 1991 and the STB in 1998 authorized that control. In concluding otherwise, the STB adopted a new rule inconsistent with its own regulation and failed to adequately explain its decision. The Court should vacate and remand.

Norfolk Southern has owned a majority, controlling share of Belt Line's stock for years. Belt Line is a switching and terminal railroad established more than a century ago as a joint venture by eight railroads. A switching and terminal railroad puts together and takes apart railcars and transfers them between different railroads. Since the 1980s, Norfolk Southern has held a majority of Belt Line's stock, with Intervenor CSX Transportation, Inc. (CSX) holding the remainder. That arrangement followed decades of congressionally promoted consolidation in the railroad industry. Thus, in 1989, CSX, recognizing Norfolk Southern's status as majority shareholder, signed an agreement allowing Norfolk Southern to

appoint three representatives to Belt Line's board and CSX to appoint just two. And in 1991 and 1998, Norfolk Southern sought and received agency authorization for intrafamily corporate reorganizations—under the so-called "corporate-family exemption"—resulting in agency approval of its control over Belt Line. *See* 49 C.F.R. § 1180.2(d)(3).

That didn't stop CSX from suing Norfolk Southern in the Eastern District of Virginia for federal antitrust and state-law violations related to an alleged conspiracy between Norfolk Southern and Belt Line to restrict CSX's access to the Norfolk International Terminal. In response, in addition to disputing the alleged conspiracy, Norfolk Southern invoked its statutory immunity from suit based on the ICC's 1982 approval of one of its railroad consolidations. *See* 49 U.S.C. § 11321(a). Agency approval gives a rail carrier immunity "from the antitrust laws and from all other law … as necessary to let that rail carrier … hold, maintain, and operate property, and exercise control or franchises acquired through" the approved transaction. *Id.* The district court referred the question to the STB. Before the STB, Norfolk Southern *also* invoked its immunity under the 1991 and 1998 corporate-family exemptions—issues it had not raised before the district court.

The Board rejected all of Norfolk Southern's arguments. *See Norfolk Southern Railway Company – Petition for Declaratory Order*, Decision, STB No. FD 36522 (June 17, 2022) (Decision) (JA__-__). As relevant here, the Board ruled that neither it nor the ICC had authorized Norfolk Southern to control Belt Line in 1991 or 1998 because the corporate-family-exemption regulation contains an "implicit" requirement of "previously authorized" control that Norfolk Southern hadn't satisfied. Decision 16 (JA__). Those rulings were arbitrary and capricious because the Board's interpretation is inconsistent with the corporate-family-exemption regulation and the Board failed to explain its reasoning.

**1.** First things first. This Court has jurisdiction. The courts of appeals have "exclusive jurisdiction" over challenges to "final orders of the Surface Transportation Board," 28 U.S.C. § 2342(5), and the "narrow" exception in 28 U.S.C. § 1336(b) doesn't apply. As this Court explained in *McCarty Farms, Inc. v. STB*, 158 F.3d 1294, 1300 (D.C. Cir. 1998), § 1336(b) establishes a "bright line rule" that "issues expressly set out in the district court's referral order are reviewed by the district court" under § 1336(b), while "[t]he court of appeals reviews all other issues" under §§ 2321(a) and 2342(5). And here, although the district court referred a question about the 1982

consolidation to the STB, Norfolk Southern first raised the 1991 and 1998 issues before the STB. This Court has jurisdiction over the 1991 and 1998 issues.

**2.**    The Board's Decision violates the Administrative Procedure Act because it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). Start with the Board's failure to comply with the text of its own corporate-family-exemption regulation. The regulation sets out several conditions—if they're satisfied, the regulation applies and the corporate-family reorganization is approved. But the Board's new prior-authorization requirement isn't one of them, as the Board itself recognized by characterizing the rule as "implicit" in the corporate-family exemption. Put simply, the Board's interpretation is inconsistent with its own regulations and invalid. And perhaps unsurprisingly, the Board also failed to engage in reasoned decisionmaking. It didn't explain the textual basis for its rule (there isn't one) or even how its rule is connected to the relevant considerations.

The proper course is to vacate and remand. As Norfolk Southern explained to the Board, Norfolk Southern satisfied the plain text of the corporate-family-exemption regulation. The ICC and STB approved Norfolk Southern's control over Belt Line. And that should come as no surprise to

the Board or CSX, which has long "acknowledg[ed] and accept[ed] [Norfolk Southern's] majority ownership and control of [Belt Line]." Decision 17 (JA__).

## STATEMENT OF ISSUES

1.    Whether this Court has jurisdiction under the Hobbs Act because Norfolk Southern asks it to review, vacate, and set aside a "final order[] of the Surface Transportation Board," 28 U.S.C. § 2342(5); *see id.* § 2321(a), on issues not "expressly set out in the district court's referral order," *McCarty*, 158 F.3d at 1300, so that the narrow exception for district court jurisdiction in 28 U.S.C. § 1336(b) does not apply.

2.    Whether the Board's rejection of Norfolk Southern's arguments as to the 1991 and 1998 corporate-family-exemption transactions is arbitrary and capricious because it rests on an atextual, impermissible interpretation of the corporate-family-exemption regulation that adds a prior-authorization requirement found nowhere in the regulation.

3.    Whether the Board's rejection of Norfolk Southern's arguments as to the 1991 and 1998 corporate-family-exemption transactions is arbitrary and capricious because the Board failed to explain its interpretation and application of the corporate-family exemption.

- 5 -

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    Legal background

### 1.    The STB reviews proposed transactions between rail carriers to promote railroad consolidation and efficient interstate rail transportation.

Congress enacted the Interstate Commerce Act (ICA), 49 U.S.C. § 10101 *et seq.*, to "promote[] railroad consolidation to create a more efficient system of interstate rail transportation." *United Transp. Union v. Burlington N. Santa Fe R.R.*, 528 F.3d 674, 677 (9th Cir. 2008) (citation omitted). The ICA requires STB (or, before 1996, required ICC) approval for certain "transactions involving rail carriers." 49 U.S.C. § 11323(a); *see id.* § 1302 (STB assumption of ICC functions). One such transaction is the "[c]onsolidation or merger of the properties or franchises of at least 2 rail carriers into one corporation for the ownership, management, and operation of the previously separately owned properties." *Id.* § 11323(a)(1). Another is a rail carrier's "[a]cquisition of control" over another carrier, including the "power to exercise control" by acquiring a majority of shares. *Id.* § 11323(a)(3); *see id.* § 10102(3) (defining "control"). As discussed below, STB or ICC approval or

- 6 -

exemption of these kinds of transactions "exempt[s]" each carrier involved "from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier … exercise control or franchises acquired through the transaction." *See id.* § 11321(a).

> **2.    The ICA and its implementing regulations provide two tracks for approving transactions and thus conferring antitrust immunity: formal approval and summary exemption procedures.**

Under the ICA and ICC/STB regulations, there are two ways the STB authorizes (or the ICC authorized) changes in control, thus conferring immunity from antitrust and other laws under 49 U.S.C. § 11321(a).

*First*, the STB can issue a formal "approval and authorization" after evaluating a voluminous application from rail carriers participating in the transaction. *Id.* § 11323(b); *see id.* § 11325 (application procedure); 49 C.F.R. § 1180.4(c)-(d).

*Second*, the statute and regulations provide for exemption processes as an alternative to the formal approval process. The ICA requires the STB (and before it, required the ICC), "to the maximum extent consistent" with the statute, to exempt transactions from the formal approval process if (1) the full approval procedures are "not necessary to carry out the transportation

- 7 -

policy of section 10101 of [the ICA]" and (2) either the transaction is "of limited scope," or the approval process "is not needed to protect shippers from the abuse of market power." 49 U.S.C. § 10502(a). The Board "*shall* exempt" a transaction meeting these two requirements. *Id.* (emphasis added).

The ICA's exemption authority reflects Congress' recognition that the formal process can frustrate the purpose of promoting railroad consolidation. *See Kessler v. STB*, 635 F.3d 1, 3 (D.C. Cir. 2011). The exemption authority is one of a host of measures designed to turn around a railroad industry that was struggling from "excessive regulation." *See The 35th Anniversary of the Staggers Rail Act: Railroad Deregulation Past, Present, and Future: Hearing Before the Subcomm. on Railroads, Pipelines, & Hazardous Materials of the H. Comm. on Transportation & Infrastructure*, 114th Cong. 1, 5 (2015) (statement of Hon. Deb Miller, Acting Chairwoman, STB), https://tinyurl.com/hxyzwckr. With the exemption, Congress sought to "ma[k]e it easier for railroads to merge" by requiring the agency to exempt carriers from regulation and instead "quickly approve transactions that were routine." *Id.* at 5.

This exemption authority "'permits the [Board] to create expedited review processes" to allow carriers to "avoid sometimes cumbersome regulatory procedures" in certain circumstances. *Snohomish County v. STB*,

954 F.3d 290, 294 (D.C. Cir. 2020) (citation omitted). As relevant here, ICC/STB regulations promulgated under § 10502(a) identify certain classes of transactions that may qualify for exemption through a notice of exemption process. 49 C.F.R. § 1180.2(d). Those regulations list nine kinds of transactions exempt from the formal application process. *Id.*

The exemption relevant here is known as the "corporate-family exemption." Promulgated in 1982, the corporate-family exemption applies to "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family." *Id.* § 1180.2(d)(3). As discussed below, Norfolk Southern's petition challenges the STB's rulings that the ICC's 1991 and the STB's 1998 approvals did not authorize Norfolk Southern to control Belt Line. *See* Pet. 3-4.

### 3. The courts of appeals have exclusive jurisdiction to review most STB decisions.

The jurisdictional question here is whether this Court or the district court presiding over an antitrust action between Norfolk Southern and CSX has jurisdiction over Norfolk Southern's challenge to the STB's rulings on the 1991 and 1998 corporate-family exemptions.

Normally, the courts of appeals have exclusive jurisdiction under the Hobbs Act to review decisions of the STB. 28 U.S.C. § 2342(5). The Hobbs Act gives the courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of … all rules, regulations, or final orders of the Surface Transportation Board," *id.*, "[e]xcept as otherwise provided by an Act of Congress," *id.* § 2321(a).

Section 1336(b) carves "a 'narrow'" exception for issues referred to the STB by a district court. *McCarty*, 158 F.3d at 1300 (citation omitted).

> When a district court … refers a question or issue to the Surface Transportation Board for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Surface Transportation Board arising out of such referral.

28 U.S.C. § 1336(b). In *McCarty*, the Court explained the interplay between § 1336(b) and the Hobbs Act: "issues expressly set out in the district court's referral order are reviewed by the district court" under § 1336(b), while "[t]he court of appeals reviews all other issues" under §§ 2321(a) and 2342(5). 158 F.3d at 1300.

### B.    Factual and procedural background

This case centers on the STB's rulings that corporate-family transactions approved in 1991 and 1998 do not authorize Norfolk Southern to control Belt Line. Since the 1980s, following decades of rail consolidation, the Norfolk Southern family has held a majority of Belt Line's shares and appointed a majority of its directors pursuant to an agreement with Belt Line's other shareholder, CSX.

The district court presiding over CSX's antitrust and state-law action against Norfolk Southern referred two questions to the STB. First, did a 1982 consolidation authorize a predecessor of Norfolk Southern to control Belt Line? If so, did that approval confer immunity for exercising that control from antitrust and state conspiracy law? The court did not refer any question on the 1991 and 1998 exemptions to the STB, and Norfolk Southern raised the 1991 and 1998 exemption issues only before the STB after the referral. Once before the STB, Norfolk Southern made new arguments that by approving its 1991 and 1998 transactions under the corporate-family exemption, the ICC and STB authorized its control of Belt Line.

Resolving the referred question, the STB decided that it had not authorized Norfolk Southern to control Belt Line in 1982. The STB then turned

to Norfolk Southern's new arguments, ruling that it did not authorize Norfolk Southern to control Belt Line in 1991 or 1998, either. The Board relied solely on a newly announced rule, not found in its regulation's text, that the corporate-family exemption can approve control only if the agency has "previously authorized" that control. Decision 16 (JA__).

### 1. Between Belt Line's 1896 establishment and the 1980s, railroad consolidations concentrate holdings of Belt Line shares between Norfolk Southern and CSX's families.

Belt Line was established in 1896 as a joint venture by eight railroads to provide those railroads switching services in Norfolk, Portsmouth, and Chesapeake, Virginia. Opening Statement and Evidence of Norfolk and Portsmouth Belt Line Railroad Company, STB No. FD 36522, at 1 (Sept. 23, 2021) (JA__) (Belt Line STB Opening). Since then, gradual consolidation in the railroad industry has left Belt Line with fewer and fewer shareholders. Before the 1980s, five railroads held Belt Line stock. Belt Line STB Opening 2 (JA__). The Chesapeake and Ohio Railway Company (Chesapeake) held 14.3%, the Seaboard Coast Line Railroad Company (Seaboard) held 28.6%, Norfolk and Western Railway Company (Norfolk and Western) held another 28.6%, Southern Railway Company (Southern) held 14.3%, and a

subsidiary of Southern owned the final 14.3%. *Id.* Today, Norfolk Southern and CSX are Belt Line's only remaining shareholders. *Id.* at Verified Statement of Donna N. Coleman 5 (JA__).

Then, in 1980, CSX assumed control of Chesapeake and Seaboard, giving it 42.86% of Belt Line's shares. *See CSX Corp. — Control — Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc.*, 366 I.C.C. 521, 521-23, 1980 WL 14204 (Sept. 23, 1980). That same year, Norfolk and Western, Southern, and other carriers applied for ICC authorization to consolidate several carriers. They proposed that NWS Enterprises, Inc., would acquire control of Norfolk and Western and its subsidiaries and Southern and the subsidiaries designated in the application's appendices as the "consolidated system companies." Decision 4 (JA__) (citation omitted). One of the appendices identified Belt Line along with all the other railroad companies in which Norfolk and Western or Southern held an ownership interest, noting that Norfolk and Western owned 28.57% of Belt Line, Southern owned 14.29%, and a Southern subsidiary owned 14.28%, for a total of 57.14%. Decision 4 n.8 (JA__). The ICC granted the application and the consolidated entity became Norfolk Southern Corporation (NSC). *See id.* As a result, CSX held 42.86% of Belt Line and NSC held the remaining 57.14%.

After the consolidations, NSC and CSX held proportional representation on Belt Line's board of directors. From 1982 to 1988, there were six board members. Belt Line STB Opening 3 (JA__). Three members were appointed by Norfolk Southern railroads, two by CSX railroads, and one was Belt Line's president and general manager. *Id.*

CSX agreed to this arrangement. In 1983, one of the Belt Line board members appointed by CSX recognized that "[NSC] owns 57% of the Belt Line." Belt Line STB Opening, Ex. C, at 2 (JA__). And in 1989, CSX and NSC agreed that "CSX[] will continue to have the right to appoint two representatives to the [Belt Line] Board of Directors, and [NSC] will have the right to appoint a total of three representatives." *Id.* at Verified Statement of Donna M. Coleman, Ex. D, at 3 (JA__).

### 2.    In 1991, the ICC grants a corporate family exemption that created Norfolk Southern.

In 1990, Southern filed an exemption with the ICC seeking direct control through stock ownership over Norfolk and Western and indirect control over Norfolk and Western's subsidiaries. Decision 16 (JA__); CSXT's Opening Statement, STB No. FD 36522, Ex. K, Notice of Exemption 1, 9 (Sept. 23, 2021) (JA__, __) (CSX STB Opening). The ICC published the application in

the *Federal Register. Southern Railway Co. – Control Exemption – Norfolk and Western Railway Co. Chesapeake Western Railway, the Toledo Belt Railway Co., and Wabash Railroad Co.; Exemption*, 56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991).

In its submission, Southern explained that it sought to consolidate because the "separate revenue, car, and other accounts for [Southern] and [Norfolk and Western] … results in considerable duplication of effort to route and exchange traffic with" those two railroad companies. CSX STB Opening, Ex. K, Notice of Exemption 4 (JA__). "In light of the growing public perception of a single Norfolk Southern rail system and the potential efficiencies and economies," Southern added, NSC had "decided to adopt single system accounting for the operations of its rail carrier subsidiaries." *Id.* Southern explained that the corporate-family exemption applied because "[t]he transaction involves only rail carrier subsidiaries of [NSC] already commonly controlled and operated as part of a corporate family." *Id.* at 7 (JA__). Finally, Southern proposed changing its name to Norfolk Southern Railway Company. *Id.* at 5 (JA__).

No person or entity objected or moved to revoke the corporate-family exemption. The ICC thus approved the transaction, *see Southern Railway*, 56

Fed. Reg. at 1541, and the newly named Norfolk Southern Railway obtained "direct control of [Norfolk and Western] and indirect control of [its] rail carrier subsidiaries," CSX STB Opening, Ex. K, Notice of Exemption 5 (JA__). Because Norfolk and Western held a 28.6% share of Belt Line, Norfolk Southern's direct control over Norfolk and Western resulting from the 1991 exemption further consolidated its 57.14% control of Belt Line.

### 3. In 1998, the STB approves further consolidation of Norfolk Southern.

In 1998, NSC sought authority, also under the corporate-family exemption, for Norfolk and Western to merge into Norfolk Southern. Decision 16 (JA__). Reporting that Norfolk Southern "and its consolidated railroad subsidiaries own or operate lines of railroad in … Virginia," CSX STB Opening, Ex. L, at 5 (JA__), NSC explained that it was the sole owner of Norfolk Southern and that Norfolk and Western was a wholly owned direct subsidiary of Norfolk Southern. *Id.* at 3 (JA__). NSC argued that consolidation would "further the goal of corporate simplification." *Id.*

As with the 1991 exemption, the STB published the 1998 exemption in the *Federal Register*. *Norfolk Southern Railway Company; Merger Exemption; Norfolk and Western Railway Company*, 63 Fed. Reg. 46278-01, 1998 WL 546005

(Aug. 31, 1998). And as with the 1991 exemption, no one objected or moved to revoke the exemption. The STB thus approved the transaction. *See id.* The STB's approval placed 57% of Belt Line under Norfolk Southern's direct control. Norfolk Southern Railway Company – Opening Statement, STB No. FD 36522, 14 (Sept. 23, 2021) (JA__) (Norfolk Southern STB Opening).

### 4. CSX sues Norfolk Southern and Belt Line and the district court asks the STB whether the 1982 consolidation authorized Norfolk Southern to control Belt Line.

In 2018, CSX sued Norfolk Southern and Belt Line in the Eastern District of Virginia, alleging antitrust, conspiracy, and contract law violations arising from Norfolk Southern's and Belt Line's alleged actions to deprive CSX of rail access to the Norfolk International Terminal. *CSX Transp., Inc. v. Norfolk S. Ry.*, No. 2:18-cv-530 (E.D. Va.). Norfolk Southern moved to dismiss on the ground that the ICC's authorization of the 1982 consolidation immunized it under 49 U.S.C. § 11321(a) from CSX's antitrust and state-law conspiracy claims. *CSX Transp., Inc. v. Norfolk S. Ry.*, No. 2:18-cv-530, 2021 WL 2908649, at *2 (E.D. Va. May 18, 2021). Alternatively, Norfolk Southern asked the court to refer the 1982 consolidation and immunity questions to the STB. *See id.* at *10. No party mentioned the 1991 or 1998 corporate-family

transactions in its briefing. *See CSX*, No. 2:18-cv-530 (E.D. Va.), ECF Nos. 116, 131, 132, 138.

The district court referred the 1982 consolidation and immunity issues to the STB, concluding the agency was the "proper authority to clarify the contours of the 1982 consolidation." *CSX*, 2021 WL 2908649, at *9. The referral order asked:

> [1] Did the 1982 consolidation, whereby NSC acquired an indirect 57 percent interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and [2] if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

*Id.* at *11.

The district court mentioned the 1991 corporate-family transaction in passing in a footnote in the factual background while explaining how Norfolk Southern came to be, calling the exemption "not critical to [its] analysis." *Id.* at *4 n.7. The court did not mention the 1991 exemption anywhere else in the referral order, and did not mention the 1998 exemption at all.

> **5.**    **The STB determines that the ICC did not authorize Norfolk Southern to control Belt Line in the 1982 consolidation and further concludes that the 1991 and 1998 exemptions did not authorize control either.**

**a.**    After the district court referred the 1982 questions to the STB, Norfolk Southern successfully petitioned the STB to institute a declaratory proceeding. *Norfolk Southern Railway Company – Petition for Declaratory Order*, Decision, STB No. FD 36522 (Aug. 9, 2021) (Pet. Order) (JA__-__). In its briefing, Norfolk Southern first addressed whether the ICC's approval of the 1982 consolidation authorized it to control Belt Line. Norfolk Southern STB Opening 4-12 (JA__-__); Norfolk Southern Railway Company's Reply to CSXT's Opening Statement, STB No. FD 36522, 32-36 (Oct. 25, 2021) (Norfolk Southern STB Reply) (JA__-__). Norfolk Southern then raised two issues it had not presented to the district court: whether the 1991 and 1998 corporate-family exemptions granted it authority to control Belt Line. Norfolk Southern STB Opening 13-14 (JA__-__); Norfolk Southern STB Reply 38-39 (JA__-__).

**b.**    On June 17, 2022, the STB issued its decision.

**i.**    The Board first addressed the referred question about the 1982 consolidation, ruling that the ICC had not authorized Norfolk Southern's predecessor to control Belt Line. Decision 9-14 (JA__-__). The STB reasoned

- 19 -

that Norfolk Southern "told the ICC and the public that [it] had no intention of controlling" Belt Line. Decision 11 (JA__). The STB explained that it would not "permit an applicant to give assurances that control will not be obtained in a transaction" and then later try to claim control. Decision 13 (JA__).

*ii.*    The STB then addressed the separate questions on the 1991 and 1998 corporate-family exemptions that the district court had not referred. The STB rejected Norfolk Southern's arguments, concluding that the ICC and STB could not have approved control over Belt Line through the corporate-family exemption "unless authority had previously been granted for some other member of [the] corporate family to control [Belt Line]." Decision 16 (JA__). To reach that result, the STB announced for the first time a categorical rule: "It is implicit in [the corporate family exemption]'s requirement that the transaction be 'within a corporate family' that the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family." *Id.* (citation omitted).

The STB offered two justifications for its rule. *First*, the Board reasoned that allowing a party to gain control through the corporate-family exemption would "effectively nullify other Board requirements," such as the

- 20 -

requirement that a party "inform[] the Board" of the transaction through "an application or another type of exemption." *Id. Second*, and relatedly, the Board explained that under Norfolk Southern's interpretation of the exemption, "the Board and the public might never even know that control authority was granted." *Id.* Thus, the Board reasoned that it must be "implicit" in the corporate-family exemption that the "member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family." *Id.* The Board offered no analysis of the regulation's text or explanation of how its prior-authorization rule furthers the regulation's purposes.

Applying its new categorical rule, the Board concluded that neither the 1991 nor the 1998 corporate-family exemption approved Norfolk Southern's control of Belt Line. Still, the Board expressed "concern[]" that CSX had seemingly "understood that [Belt Line] was under the control of [Norfolk Southern]" for decades without objecting. Decision 16-17 & n.24 (JA__-__).

### 6. Norfolk Southern petitions this Court and files a protective complaint before the district court.

On August 15, 2022, Norfolk Southern petitioned this Court for review of the STB's rulings as to the 1991 and 1998 corporate-family exemptions.

Pet. 3-5. Norfolk Southern also filed a protective complaint under § 1336(b) in the Eastern District of Virginia, asking the district court to hold the case in abeyance pending resolution of the proceedings before this Court. Compl. 14, *Norfolk S. Ry. v. STB*, No. 2:22-cv-385, ECF No. 1 (E.D. Va. Sept. 15, 2022).

CSX intervened before this Court in defense of the STB's rulings. CSX and the government then moved to dismiss, contending that the district court has exclusive jurisdiction under 28 U.S.C. § 1336(b). After briefing on the motions to dismiss concluded, this Court ordered expedited briefing on the merits. Dec. 15, 2022, Order.

On January 3, 2023, the district court in *CSX* granted summary judgment in favor of Norfolk Southern on CSX's federal antitrust damages claims and all state law claims, concluding that CSX had pointed to no evidence that it "was *actually damaged* during the limitations period." No. 2:18-cv-530, 2023 WL 25344, at *27. A bench trial is set to begin January 18, 2023, on the sole remaining claim for injunctive relief. *Id.* at *35.

## SUMMARY OF ARGUMENT

I.    The Court has jurisdiction over Norfolk Southern's petition.

A.    Section 1336(b) carves a narrow exception out of the courts of appeals' exclusive jurisdiction under the Hobbs Act to review STB decisions.

In *McCarty*, the Court held that the courts of appeals review all issues that a district court has not expressly referred to the STB. 158 F.3d at 1300. The Court thus has jurisdiction over Norfolk Southern's challenges to the STB's rulings on the 1991 and 1998 corporate-family-transaction issues, because the district court did not refer those issues to the STB. The district court's referral order asked only whether the 1982 consolidation authorized Norfolk Southern's predecessors to control Belt Line and, if so, whether that authorization conferred immunity from antitrust and state conspiracy law.

**B.**     The government and CSX claim that the district court that referred the 1982 consolidation question has exclusive jurisdiction under § 1336(b). Those arguments lack merit. *First*, attempts to distinguish *McCarty* ignore the Court's "bright line rule" that only those "issues expressly set out in the district court's referral order are reviewed by the district court." 158 F.3d at 1300. *Second*, the government and CSX incorrectly claim that the district court *did* refer the 1991 and 1998 corporate-family-transaction issues. The district court mentioned the 1991 transaction "for context" in a footnote in the background section of its opinion, calling it "not critical to [its] analysis." *CSX*, 2021 WL 2908649, at *4 n.7, and it did not mention the 1998 transaction at all. *Third*, the government and CSX contend that the district

- 23 -

court must have referred the 1991 and 1998 questions to the STB because Norfolk Southern raised the 1991 and 1998 transactions before the STB. But that's not how § 1336(b) works. *McCarty* made clear that the analysis turns on the questions the district court expressly referred to the agency. *Finally*, the STB and United States' judicial economy argument fails both because it ignores *McCarty*'s rule and because this Court's review will promote, not undermine, judicial economy.

**II.**     The STB's ruling that neither the 1991 nor the 1998 corporate-family exemption authorized Norfolk Southern's control of Belt Line is arbitrary and capricious. The STB's ruling rests on its interpretation of the corporate-family-exemption regulation to prohibit changes of control that the agency has not "previously authorized." Decision 16 (JA__). That novel prior-authorization rule has no basis in the regulation's text. What's more, the STB failed to reasonably explain the basis for the new rule. It did not connect the rule to regulatory text or the policy purposes it recited. The Board thus also flunked the APA's reasoned decisionmaking requirement. The Court should vacate and remand.

**A.**     The APA requires courts to set aside arbitrary and capricious STB actions and interpretations. 5 U.S.C. § 706(2)(A); *see, e.g., Snohomish*

- 24 -

*County*, 954 F.3d at 301. An agency acts arbitrarily and capriciously when it acts inconsistently with its own regulations. The court "begin[s] [its] interpretation of the regulation with its text." *Green v. Brennan*, 578 U.S. 547, 553 (2016). And under the familiar *expressio unius* canon, when a regulation lists particular requirements, the agency cannot impose add other, atextual requirements. An agency also acts arbitrarily and capriciously when it fails to engage in "reasoned decisionmaking" because it fails to explain the textual basis for its decision or otherwise explain how its decision rests on the relevant considerations. *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted).

**B.**     The STB's rulings on the 1991 and 1998 corporate-family exemptions rested on a newly announced categorical prior-authorization rule decades after the fact with no basis in the text of the corporate-family-exemption regulation. That regulation requires the Board to approve transactions within a corporate family if the transaction (1) does not result in "adverse changes in service levels"; (2) does not result in "significant operational changes"; and (3) does not "change … the competitive balance with carriers outside the corporate family." 49 C.F.R. § 1180.2(d)(3). That exhaustive list leaves no room for the Board's added requirement. And several

features of the regulatory and statutory structure, including the regulation's competitive-balance requirement and the statute's publication requirement, already address the Board's concerns about approval of anticompetitive transactions, underscoring the inconsistency of the Board's new rule with its regulations.

The Board's counterarguments fail. For one thing, the Board cannot use purpose to trump text. For another, the Board's interpretation cannot receive deference, because the regulation is not ambiguous, let alone "genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). And even if it were, the Board's meager reasoning hardly qualifies as the "fair and considered judgment" required for deference. *Id.* at 2417 (citation omitted). Finally, even if the STB's rule were permissible, the Board cannot apply it retroactively to transactions approved in 1991 and 1998, because the APA permits only *prospective* rules, and the Board's rule didn't exist until 2022.

**C.**    The Board also failed to engage in reasoned decisionmaking. Its single paragraph justifying its new prior-authorization rule ignores the corporate-family regulation's text and offers only policy generalizations. That is insufficient.

**D.**    The Court should vacate and remand. That is the ordinary remedy when an agency violates the APA. It is all the more warranted here, where the record shows that the Board's approval of the 1991 and 1998 transactions authorized Norfolk Southern to control Belt Line. Norfolk Southern complied with each of the corporate-family exemption's requirements, and the Board's approval of the 1991 and 1998 transactions authorized Norfolk Southern's control.

## STANDING

Norfolk Southern must establish Article III standing and show that it is a "party aggrieved" by the STB Decision, 28 U.S.C. § 2344; *see id*. § 2342(5); 5 U.S.C. § 702. Norfolk Southern meets both requirements.

Norfolk Southern has constitutional standing because it has suffered an injury-in-fact caused by the Board's Decision and redressable by this Court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The STB rejected Norfolk Southern's claims that the ICC in 1991 and STB in 1998 authorized it to control Belt Line. Decision 16 (JA__). Those rulings injured Norfolk Southern by rejecting its claim that its operation of Belt Line is immune under 49 U.S.C. § 11321(a) from antitrust scrutiny and other laws. Decision 9 (JA__). Norfolk Southern's injury "may be redressed if the court

grants its petition for review." *Burlington N. & Santa Fe Ry. v. STB*, 403 F.3d 771, 776 (D.C. Cir. 2005).

Norfolk Southern is a "party aggrieved" by the STB decision, 28 U.S.C. § 2344, because it "participat[ed] in the agency proceedings under review." *Brotherhood of Locomotive Eng'rs v. United States*, 101 F.3d 718, 723 (D.C. Cir. 1996). Norfolk Southern was the petitioner before the STB in proceedings addressing whether the ICC or STB had authorized Norfolk Southern in 1991 or 1998 to control Belt Line and thus conferred antitrust immunity on Norfolk Southern under 49 U.S.C. § 11323(a). And although Norfolk Southern thus also satisfies any prudential test, this Court's "cases have repeatedly recognized the non-jurisdictional nature of the zone of interests test." *CSL Plasma Inc. v. U.S. Customs and Border Prot.*, 33 F.4th 584, 588 (D.C. Cir. 2022).

## ARGUMENT

### I. This Court has jurisdiction to consider Norfolk Southern's petition for review.

#### A. This Court has jurisdiction over Norfolk Southern's claims under the Hobbs Act.

##### 1. The courts of appeals review all issues other than those expressly set out in the district court's referral order.

The courts of appeals review all issues that a district court has not referred to the STB. As noted, the Hobbs Act vests the courts of appeals with

"exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of … all rules, regulations, or final orders of the Surface Transportation Board," 28 U.S.C. § 2342(5), "[e]xcept as otherwise provided by an Act of Congress," *id.* § 2321(a). Section 1336(b) carves "a 'narrow'" exception to that jurisdiction, *McCarty*, 158 F.3d at 1300 (citation omitted), for "a question or issue" that a district court referred to the STB, 28 U.S.C. § 1336(b).

In *McCarty*, the Court explained that § 1336(b) establishes a clear and administrable "bright line rule" for parties "seeking review of an STB decision." 158 F.3d at 1300. *McCarty* held that "issues expressly set out in the district court's referral order are reviewed by the district court" under § 1336(b), while "[t]he court of appeals reviews all other issues" under §§ 2321(a) and 2342(5). 158 F.3d at 1300; *supra* pp. 9-10. The Court reasoned that whether a claim "arise[s]" out of a referral to the STB under § 1336(b) turns on whether the issue "originate[s]" in the referral. *McCarty*, 158 F.3d at 1299 (quoting *Black's Law Dictionary* 99 (5th ed. 1979)). And claims do not "originate in the district court's referral" where the referral does not "mention" or "reference" them. *Id.* A claim cannot "'arise' out of a referral that makes no mention of them." *Id.*

- 29 -

The Court also explained that its interpretation of § 1336(b) was "consistent with congressional intent." *Id.* at 1300. "Although members of Congress may have expressed an intent to further judicial economy," *id.*, the Court reasoned, its interpretation of § 1336(b) "reduce[s] the chance that appeals are made to the wrong court," *id.* (quoting *Union Pac. R.R. v. Ametek, Inc.*, 104 F.3d 558, 566 (3d Cir. 1997) (Roth, J., dissenting)). Under the Court's easily administrable "bright line rule," "'[c]ounsel need only look to the language of the district court's referral order to determine whether the issue was properly reviewable by a district court.'" *Id.* (quoting *Ametek*, 104 F.3d at 566 (Roth, J., dissenting)).

> **2.    This Court has jurisdiction over Norfolk Southern's challenge to the STB's rulings on the 1991 and 1998 issues not referred by the district court.**

**a.**    *McCarty* makes clear that this Court has jurisdiction to review the STB's decision on the 1991 and 1998 corporate-family exemption questions not referred to the STB by the district court. The 1991 and 1998 exemptions were not "expressly set out in the district court's referral order." *McCarty*, 158 F.3d at 1300. Indeed, the district court analyzed the 1982 consolidation and its potential antitrust immunity implications at length without mentioning the 1991 or 1998 corporate-family transactions. *See CSX*,

- 30 -

2021 WL 2908649, at *5-10. It then referred to the STB only the questions whether "the 1982 consolidation … involve[d] the ICC/STB granting NSC 'approval' to control Belt Line," and, if so, whether that authorization conferred immunity. *Id.* at *11.

The specific language in the referral underscores that the district court did not refer any unraised questions relating to the 1991 and 1998 exemptions. The 1991 and 1998 questions concern whether Norfolk Southern was authorized to control Belt Line and whether those transactions entitle *Norfolk Southern* to antitrust immunity. But the referral asked whether the 1982 consolidation granted *NSC* control authorization and, if so, whether *NSC* obtained antitrust immunity. *See id.* But NSC, the consolidated entity that resulted from the 1982 consolidation, no longer existed after the 1991 corporate-family transaction, *see supra* p. 15; indeed, the referral order called the current entity, Norfolk Southern Railway Company, "NSR," *see CSX*, 2021 WL 2908649, at *1. In sum, the district court's focus on NSC confirms that the court referred only the 1982 consolidation question and dependent immunity issue. That makes sense.

**b.** District court review here also wouldn't make practical sense. *McCarty* gave "parties a bright line rule" turning on the district-court's

- 31 -

express referral. 158 F.3d at 1300. Faithfully adhered to, *McCarty*'s rule would prevent disputes like the motions now before the Court. And for good reason. The district court would be in no better position than this Court to resolve Norfolk Southern's challenges to the STB's rulings on the 1991 and 1998 corporate-family transactions. The relevant facts are not in the district court record, and the district court has considered no briefing on, much less authored an opinion addressing, the 1991 and 1998 issues. Instead, the district court has confined its review to whether the 1982 consolidation gave Norfolk Southern control over Belt Line. Decision 1 (JA__).

What's more, appellate review here would promote efficiency. Unlike in *McCarty*, where the petitioner challenged the STB's decision on a mix of referred and unreferred issues—and the Court still adhered to its "bright line rule"—this Court's review here would not involve any "duplication of judicial effort." 158 F.3d at 1300. Norfolk Southern challenges the STB's decision only on the unreferred 1991 and 1998 issues. Pet. 3-4. Appellate review would give the parties an efficient, definitive ruling on *all* the issues Norfolk Southern raises.

## B.    The government and CSX's counterarguments lack merit.

### 1.    Attempts to distinguish *McCarty* ignore this Court's clear, "bright line rule."

Unable to show that they win under *McCarty*'s clear rule, the government and CSX look for a way around it. Those efforts fail. *First*, the government and CSX try to distinguish *McCarty* on its facts, but this Court's rule was not so narrow. *Second*, the government and CSX argue that *McCarty* didn't really establish a bright-line rule. These arguments, too, flout *McCarty*'s clear holding: "issues expressly set out in the district court's referral order are reviewed by the district court." 158 F.3d at 1300.

**a.**    The government and CSX first try to distinguish *McCarty* on its facts. They claim that the district court in *McCarty* didn't have jurisdiction under § 1336(b) only because the claims there couldn't have been brought in the district court in the first place. STB Mot. 18-19; CSX Mot. 13-14. CSX adds that in *McCarty* the ICC initiated separate proceedings to address the unreferred issues, because the ICC "did not believe they were part of the district court's referral." CSX Reply 8-9 (quoting *McCarty*, 158 F.3d at 1296). But *McCarty*'s rule doesn't turn on either peculiarity. True, Norfolk Southern could have raised the 1991 and 1998 issues before the district court. But it

didn't, and the district court did not refer those issues to the STB. Nor did *McCarty*'s rule hinge on what the ICC thought about the scope of the district court's referral (and, in any event, the ICC in *McCarty* "consolidated the proceedings," 158 F.3d at 1296-97, so they were functionally all one consolidated proceeding anyway). The result is clear under *McCarty*: this Court has jurisdiction because the 1991 and 1998 issues were not "expressly set out in the district court's referral order." *Id.* at 1300; *see supra* pp. 30-31.

The Third and Eighth Circuit decisions (STB Mot. 14-15) don't suggest otherwise. Start with the Eighth Circuit, which observed that its "conclusion may appear to be at odds with" *McCarty* and could do no better than try to distinguish *McCarty*'s facts. *Railroad Salvage & Restoration, Inc. v. STB*, 648 F.3d 915, 920-21 (8th Cir. 2011). Although the Eighth Circuit ultimately concluded that its decision "does not conflict with" *McCarty* based on the facts, *id.*, it could not square its rule with *McCarty*'s.

The Third Circuit's decision in *Ametek* is even less helpful to the government and CSX. For one thing, the ICC in *Ametek* addressed an issue logically antecedent to the referred issue. *See* 104 F.3d at 561 (explaining STB's reasoning that it could not reach referred issue of "reasonableness of the demurrage charges" "before" analyzing "if the demurrage charges

apply" in the first place (quoting ICC decision)). Here, in contrast, the STB did not need to resolve the 1991 and 1998 issues to answer the referred 1982 consolidation question. More importantly, *McCarty* rejected *Ametek*'s purposive approach, relying instead on *Ametek*'s *dissent* in articulating § 1336(b)'s "narrow" "bright line rule." 158 F.3d at 1299-1300 (citing *Ametek*, 104 F.3d at 566 (Roth, J., dissenting)). Indeed, the Court quoted the dissent's view that "[c]ounsel need only look to the language of the district court's referral to determine whether the issue was properly reviewable by a district court." *Id.* at 1300 (quoting *Ametek*, 104 F.3d at 566 (Roth, J., dissenting)). Again, as *McCarty* put it, only "issues expressly set out in the district court's referral order are reviewed by the district court. The court of appeals reviews all other issues." *Id.*

    **b.**    The government and CSX next argue that *McCarty* didn't really mean what it said. *First*, the government tries to rewrite *McCarty*'s test, claiming that "the Court did not use the word 'issues,'" in *McCarty* "narrowly," but rather "referred to broad claims or disputes," whereas Norfolk Southern reads "issue" to mean a "specific factual or legal argument[]." STB Reply 6-7. But *McCarty* contained no such qualification, and the government's argument fails on its own terms. Norfolk Southern's complaints

about the STB's interpretation of the 1991 and 1998 corporate-family exemptions present different issues from what occurred during the consolidation years earlier in 1982. *See supra* pp. 30-32.

*Second*, CSX contends that *McCarty* didn't really "rely on" the bright-line rule it articulated because "the Court had already utilized the term 'hold'" before it explained the rule. CSX Reply 6-7. But that argument proves nothing. *McCarty*'s rule applies, even if the Court explained it after using the term "hold" in a topic sentence before explaining its reasoning. *See* 158 F.3d at 1299-1300. At bottom, CSX's argument is no more than a complaint about how the Court wrote *McCarty*. But there is no doubt that *McCarty* set out a clear and administrable bright-line rule that, in the Court's words, "issues expressly set out in the district court's referral order are reviewed by the district court. The court of appeals reviews all other issues." *Supra* pp. 9-10. And under that rule, this Court has jurisdiction.

### 2. The notion that the district court referred the 1991 and 1998 issues is wrong.

Despite the clear language of the referral order, the government and CSX next argue that the district court *did* refer the 1991 and 1998 issues to the STB. That contention lacks merit.

- 36 -

*First*, the STB points to the district court's footnote mentioning the 1991 corporate-family transaction. STB Mot. 9, 16 (referring to "the 1990 transaction"). But that footnote, provided "for context," *CSX*, 2021 WL 2908649, at *4 n.7, is not a referral. CSX and the government concede that "[t]he EDVA referral order unquestionably framed the referred question around the 1982 merger"; that "the issues concerning the 1991 and 1998 transactions are distinct"; and that Norfolk Southern first raised the antitrust implications of the 1991 and 1998 transactions in its briefing before the STB. CSX Mot. 10; *see* STB Mot. 6-7, 10. And the STB acknowledges that the district court did not mention the 1998 corporate-family transaction in the referral order. STB Mot. 19. The passing footnote reference to the 1991 transaction—which the district court called "not critical to [its] analysis," *CSX*, 2021 WL 2908649, at *4 n.7—is not a referral and thus fails *McCarty*'s bright-line rule.

*Second*, the government claims that "the referral order as a whole" shows that the referral encompasses the 1991 and 1998 issues. STB Mot. 16. But that's not the test. *McCarty* adopted "a strict construction of Section 1336(b)," making clear that only "issues expressly set out in the district court's referral order are reviewed by the district court. The court of appeals

- 37 -

reviews all other issues." 158 F.3d at 1300. *McCarty*'s rule forecloses the STB's approach. *See id.*

*Third*, the government and CSX argue that the 1991 and 1998 corporate-family-exemption issues relate to, "flow from," "or grow out of" the referred 1982 consolidation issue because the STB's resolution of the 1991 and 1998 issues turned on Norfolk Southern's failure to obtain earlier authorization to control Belt Line. STB Reply 5-8; *accord* CSX Mot. 11-12; STB Reply 1-3; CSX Reply 8-9. But that argument again ignores *McCarty*'s express-referral test, which is not a relationship test. *See* 158 F.3d at 1299-1300. A relationship test would eviscerate *McCarty*'s "bright line rule," *id.* at 1300, forcing litigants and courts alike to determine, with no predictable standard, which issues are related enough to the referred question to go back to the district court.

In any event, the district court has no comparative advantage in reviewing the 1991 and 1998 issues Norfolk Southern raises. *Supra* pp. 31-32. Reviewing the 1991 and 1998 issues does not involve revisiting the referred 1982 issue. At the same time, as noted, the STB did not need to address the 1991 and 1998 issues before it could resolve the 1982 issue (unlike the situation in *Ametek*, 104 F.3d at 560-62, *see supra* pp. 34-35). In fact, the district

court and STB both analyzed the 1982 issue without mentioning the 1991 or 1998 issues. Any relationship between the referred 1982 issue and the unreferred 1991 and 1998 issues doesn't support the government and CSX's position.

*Finally*, CSX contends that this Court's exercise of jurisdiction would "circumvent the authority of the [district court]" over the 1991 and 1998 issues. CSX Mot. 14. Even putting aside its circularity, that argument fails. For one thing, the district court hasn't opined or even received briefing on the 1991 and 1998 corporate-family transactions. *Supra* p. 32. For another, CSX's implicit point seems to be that a party must first raise before a district court any argument it wishes to make before the STB. But CSX has cited no authority for such an exhaustion requirement, and Norfolk Southern is unaware of any. To the contrary, STB proceedings are not limited to the contours of district-court referrals. *See* 49 C.F.R. § 1117.1. Again, the "exception to [this Court's] jurisdiction under the Hobbs Act found in § 1336(b) is a 'narrow' one," reaching only issues "expressly set out in the district court's referral order." *McCarty*, 158 F.3d at 1300 (citation omitted).

### 3. The government and CSX mistake the scope of the agency proceedings for the scope of the referral.

The government and CSX insist that, because Norfolk Southern presented the 1991 and 1998 transactions to the STB, it can't "credibly challenge" whether those transactions were referred to the STB. STB Mot. 17; *accord* CSX Mot. 9-11; *see* STB Reply 3-4; CSX Reply 3-4. Again, the test looks to the scope of the referral, *McCarty*, 158 F.3d at 1300—not the scope of the STB proceedings. True, the STB proceedings went beyond the referral in addressing the 1991 and 1998 issues, but the STB's jurisdiction isn't limited to referred questions. Indeed, the STB grounded its jurisdiction in its "discretionary authority to issue a declaratory order to terminate a controversy or remove uncertainty" under 5 U.S.C. § 554(e) and 49 U.S.C. § 1321. Pet. Order 2 (JA__). Norfolk Southern's presentation of new issues before the STB does not transform the district court's specific referral about the 1982 consolidation into a free-ranging referral "to determine whether Norfolk Southern's claim of immunity could be grounded in *an* agency authorization." STB Mot. 16 (emphasis added). Indeed, the referred immunity question expressly arose only "if" the STB found that *the 1982 consolidation* authorized control over Belt Line. *CSX*, 2021 WL 2908649, at \*11; *supra* p. 18.

### 4.    The government's policy argument fails.

The government argues that dismissal would serve judicial economy by allowing the district court to "reach a final decision … without having to wait for another court to rule." STB Mot. 20-21; *see* STB Reply 8-10. That argument lacks merit. *First*, *McCarty* considered and rejected such policy arguments in announcing its "bright line rule." *See* 158 F.3d at 1300. To borrow from Judge Posner's opinion on a similar § 1336(b) issue, the government's argument "exemplifies the persistent fallacy of confusing the rationale behind a statute with the meaning of the statute." *Railway Lab. Execs. Ass'n v. ICC*, 894 F.2d 915, 918 (7th Cir. 1990).

*Second*, the argument is wrong on its own terms anyway, because proceeding before this Court is more efficient than sending the unreferred 1991 and 1998 issues to the district court. The district court, as noted, has neither received briefing on nor decided anything about the 1991 and 1998 issues, so it is no better positioned than this Court to address them. *Supra* pp. 31-32. As *McCarty* put it, "there is little danger of 'piecemeal appeals' where the disputed claims are not raised with the district court, but rather are brought before the STB in the first instance." 158 F.3d at 1300. Prompt appellate resolution of Norfolk Southern's challenges—under the expedited schedule this

Court has set—will best promote judicial economy by giving the district court definitive guidance.

## II.   The STB's rulings as to the 1991 and 1998 corporate-family exemptions violate the Administrative Procedure Act.

The STB's conclusion that the 1991 and 1998 corporate-family exemptions did not authorize Norfolk Southern's control over Belt Line is arbitrary and capricious for two reasons. *First*, the STB announced in its Decision, for the first time, that the corporate-family exemption contains an "implicit" limitation that it can never apply if the transaction results in control of a rail carrier. That prior-authorization requirement is an atextual and illogical interpretation of the Board's regulations. *Second*, the STB's single paragraph of reasoning failed to adequately explain the textual basis for its new rule or connect the rule to the relevant considerations. Especially given that the regulation's plain text is not ambiguous, the Court should vacate the STB's ruling on the 1991 and 1998 corporate-family transactions and remand to the agency for further consideration.

### A.   STB rulings must comply with the APA.

The D.C. Circuit reviews STB rulings under the APA, examining whether the Board's action was "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see, e.g.*, *Riffin v. STB*, 592 F.3d 195, 197 (D.C. Cir. 2010). Under the APA, an agency action or interpretation is arbitrary and capricious where it is inconsistent with the regulation the agency is interpreting. The APA thus prohibits an agency from announcing new requirements under the guise of interpreting existing regulations. The APA also requires agencies to supply reasoned explanations for their actions. In short, the APA forbids agencies from ignoring the text of their regulations and from adopting a rule based on vague policy preferences.

1.    **An agency acts arbitrary and capriciously when it relies on an interpretation of a regulation inconsistent with the regulation's plain text.**

Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). One way that an agency acts arbitrarily and capriciously is when it acts inconsistently with its own regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). A court thus "must overturn agency action and interpretation inconsistent with the

regulations and statutes themselves." *Shepherd v. Merit Sys. Prot. Bd.*, 652 F.2d 1040, 1043 (D.C. Cir. 1981).

To determine whether an agency's action or interpretation comports with its regulations, a court "must apply all traditional methods of interpretation" to the regulations. *Kisor*, 139 S. Ct. at 2419; *see Green*, 578 U.S. at 553. Text, of course, comes first. *See Kisor*, 139 S. Ct. at 2419. If the agency's interpretation "would contravene the plain text of its own regulations," then the interpretation is invalid. *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018). Thus, an agency acts arbitrarily and capriciously when it imposes new requirements beyond those in its regulations, because an interpretation purporting to identify "an unwritten but implied … requirement is 'plainly erroneous or inconsistent' with the" regulation. *Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 528 (8th Cir. 1995) (citation omitted). As the Supreme Court has put it, to allow an agency to add requirements to an unambiguous regulation "would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000); *see also, e.g.*, *Beazer E., Inc. v. United States EPA*, 963 F.2d 603, 607 (3d Cir. 1992) ("[W]e are not at liberty to allow the agency to imply language that does not exist in the regulation."). This

rule is a straightforward application of the *expressio unius est exclusio alterius* canon: when a regulation sets out a series of precise requirements, it is unlikely that the regulation intended further requirements. *See, e.g.*, *St. Helena Clear Lake Hosp. v. Becerra*, 30 F.4th 301, 304 (D.C. Cir. 2022). What's more, allowing an agency to read implicit requirements into its regulations "would create numerous difficulties for the regulated industry." *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 276 (2009).

An agency also cannot circumvent plain regulatory text by pointing to purpose or policy preferences, *see, e.g.*, *Transactive Corp. v. United States*, 91 F.3d 232, 238 (D.C. Cir. 1996), or by seeking deference to its interpretation. Start with purpose. An agency cannot rewrite "plain text" by pointing to purpose. That's just basic textual interpretation. *See, e.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 403 (2010); *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 317 (2011). Agencies do not get special rules—like courts, they cannot disregard plain text in the name of policy. *See, e.g.*, *Landstar Express Am., Inc. v. Federal Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009); *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 337 (D.C. Cir. 2020).

Similarly, a court will not defer to an agency's interpretation of its regulations that is "plainly erroneous or inconsistent with the regulation."

*Gonzales v. Oregon*, 546 U.S. 243, 256 (2006) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). To the contrary, an agency interpretation inconsistent with a regulation is invalid and must be struck down. *See, e.g.*, *Alhambra Hosp. v. Thompson*, 259 F.3d 1071, 1076 (9th Cir. 2001) (refusing deference to the agency's interpretation inconsistent with the regulation "plain on its face," and ordering the agency to comply with the plain text of its regulation). The "possibility of deference" to an agency's interpretation of its own regulation "can arise only if a regulation is genuinely ambiguous" after the "court has resorted to all the standard tools of interpretation." *Kisor*, 139 S. Ct. at 2414.

Even then, deference is appropriate only if the agency's "interpretation is authoritative, expertise-based, considered, and fair to regulated parties." *Id.* at 2419. In *Huashan Zhang v. United States Citizenship and Immigration Services*, 978 F.3d 1314, 1322 (D.C. Cir. 2020), for example, this Court rejected an agency interpretation, reasoning that a reviewing court "cannot disregard the plain meaning of a regulation based on policy considerations." *Kisor* also cautions against deferring to an agency "interpretation that would have imposed retroactive liability on parties for longstanding conduct that the agency had never before addressed." 139 S. Ct. at 2418. That rule flows from

the axiom that "[r]etroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

### 2.    The APA also requires a reasoned explanation for agency action.

On top of requiring agencies to adhere to their own regulations, the APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). One fundamental requirement is that agencies engage in "reasoned decisionmaking." *Michigan*, 576 U.S. at 750 (citation omitted). If they fail to do so, they act arbitrarily and capriciously. *Id.*; 5 U.S.C. § 706(2)(A). This requirement is "[o]ne of the basic procedural requirements of administrative rulemaking." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

To engage in reasoned decisionmaking, an agency "must articulate the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision." *Jost v. STB*, 194 F.3d 79, 88 (D.C. Cir. 1999). The requirement "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Department of Com. v. New York*,

139 S. Ct. 2551, 2575-76 (2019). The basis for an administrative action must

"be set forth with such clarity as to be understandable. It will not do for a

court to be compelled to guess at the theory underlying the agency's action;

nor can a court be expected to chisel that which must be precise from what

the agency has left indecisive." *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97

(1947). A reviewing court "may not supply a reasoned basis" for a decision

of the STB that the STB "itself has not given." *Jost*, 194 F.3d at 85 (citation

omitted).

Reasoned decisionmaking requires the agency to consider and explain

its assessment of all relevant factors. *See, e.g.*, *Carlson v. Postal Regul. Comm'n*,

938 F.3d 337, 343-45 (D.C. Cir. 2019); *Manufacturers Ry. v. STB*, 676 F.3d 1094,

1097 (D.C. Cir. 2012). An agency flunks that requirement when it fails to

ground its decision in the relevant statutory or regulatory text offer any tex-

tual support for its decisionmaking. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S.

497, 532, 535 (2007). Similarly, an agency also fails to reasonably explain its

decision when it relies on atextual requirements. *See, e.g.*, *Union Nat'l Bank of*

*Pittsburgh v. ICC*, 569 F.2d 742, 750-51 (3d Cir. 1977) (granting petition for

review of ICC order because the court was "unable to determine" whether

the ICC violated the APA because it "appear[ed] to rely heavily on matters

extraneous to [the relevant] standard"). It also flunks the reasoned deci-sionmaking requirement when its explanation "cross[es] the line from the tolerably terse to the intolerably elliptic." *Jost*, 194 F.3d at 88 (citation and quotation marks omitted).

### B. The STB's ruling on the 1991 and 1998 exemptions is arbitrary and capricious because it rests on a rule that is inconsistent with the regulation the STB purported to apply.

The STB's rulings on the 1991 and 1998 corporate-family exemptions is arbitrary and capricious because it rests on a categorical rule that is incon-sistent with the corporate-family exemption the agency claimed it was interpreting. In fact, rather than interpret the regulation, the agency pur-ported to add a requirement not found in the regulation's text and contradicted by its structure. The plain text of the corporate-family exemp-tion requires the STB to approve "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the cor-porate family." 49 C.F.R. § 1180.2(d)(3). The STB's 1991 and 1998 rulings grafted onto this regulation an "implicit" requirement that any changes in control must have been previously authorized. As an ordinary matter of tex-tual interpretation, the STB's interpretation is inconsistent with the

regulation and is thus arbitrary and capricious. And statutory and regulatory structure confirm that point: The corporate-family exemption, and the ICA itself, already build in substantive and procedural protections that address the concerns behind the STB's "implicit" requirement. The Board's view of the regulation's purpose cannot trump the regulation's clear text, and the regulation's unambiguous text leaves the agency without a hook to claim deference. Nor can the agency defend its interpretation as a new rule, because under the APA rules can have only prospective effects. And here, the STB's 2022 decision purports to foreclose Norfolk Southern's claims of antitrust immunity based on transactions that occurred decades earlier.

> **1.    The STB's interpretation of the corporate-family exemption is inconsistent with the text and structure of the regulation.**

The STB's interpretation of the corporate-family exemption is arbitrary and capricious because it is inconsistent with the "plain words of the regulation," *Seminole Rock*, 325 U.S. at 414, and the regulation's structure.

**a.**    For starters, the corporate-family exemption regulation provides a clear, specific, and exclusive set of conditions for applying the exemption. Transactions must be "within a corporate family" and they cannot "result in adverse changes in service levels," or cause adverse "significant operational

- 50 -

changes," nor can they result in a "change in the competitive balance with carriers outside the corporate family." 49 C.F.R. § 1180.2(d)(3). But the STB's interpretation of the regulation purported to add another requirement to that list: that "the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family." Decision 16 (JA__).

That addition was amendment, not interpretation. As discussed, when a statute or regulation "specifically enumerates" certain requirements in a list, the *expressio unius est exclusio alterius* canon counsels against adding any implicit requirements to the list. *Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d 880, 891 (D.C. Cir. 2021). The presumption is that the regulation speaks exhaustively, and purporting to find new requirements in the regulation amends rather than interprets it. Agencies can of course amend their regulations, but they cannot do so under the guise of interpretation. And although the agencies have amended the exemptions regulation several times since its promulgation in 1982, they have never changed the text of the corporate-family exemption.

**b.**     Regulatory and statutory structure reinforces this understanding. The problem isn't just that the STB's novel prior-authorization

- 51 -

requirement amends an exhaustive list, but that the addition is superfluous in substance to the listed conditions and ignores other regulatory and statutory provisions. Contrary to the STB's justifications, the listed conditions provide three checks to ensure that approval of an exemption satisfies the regulation and the underlying statute.

*First*, for the exemption to apply, the transaction cannot result in a "change in the competitive balance with carriers outside the corporate family." 49 C.F.R. § 1180.2(d)(3). In other words, the regulation's very first factor already addresses the concern about permitting anticompetitive transactions that the agency cited to justify adding a new prior-authorization requirement. And the agency has long adhered to its competitive-balance requirement as a key criterion for the exemption. In 1992, for instance, the ICC proposed a rulemaking that would curtail the class exemption to exempt only "transactions within a corporate family that do not result in adverse changes in service levels." *Railroad Consolidation Procedures: Class Exemption for Transactions Within a Corporate Family*, 57 Fed. Reg. 34891-02, 34891, 1992 WL 187987 (Aug. 7, 1992). But the agency then rejected that change, voting to maintain the current requirements. *49 CFR Part 1180: Railroad Consolidation Procedures: Class Exemption For Transactions Within A*

*Corporate Family*, 1993 WL 17884 (Jan. 19, 1993). Put simply, the ICC rejected an effort to eliminate the competitive-balance requirement. If the STB wanted to amend the regulation to address concerns about anticompetitive effects, it could have initiated notice-and-comment rulemaking just as it did in 1992.

*Second*, other regulated parties can intervene in the exemption proceeding to object to the exemption's application if they believe the requirements for the exemption have not been met. *See* 49 C.F.R. § 1180.4(g)(v). The exemptions require notice to be publicly filed in the Federal Register "within 16 days of the filing of the notice." *Id.* § 1180.4(g)(iii). And objections are common. *See, e.g.*, *Merger – The Baltimore & Ohio Railroad Co. & The Chesapeake & Ohio Railway Co.*, ICC No. FD 31035, 1988 WL 225928, at *1 (Feb. 22, 1988); *Delaware & Hudson Railway Co. – Lease & Trackage Rights Exemption – Springfield Terminal Railway Co.*, 4 I.C.C.2d 322, 333-34 (Feb. 17, 1988) ("We have stated in the past that while class exemptions permit the vast majority of covered transactions to go forward without specific prior approval, we stand ready to consider any necessary modifications to a particular exempted transaction in exceptional circumstances such as those found here.").

*Third*, the STB can revoke an exemption at any time if it concludes that revocation is "necessary to carry out the transportation policy of section 10101." 49 U.S.C. § 10502(d). Revocation, too, is common. *See, e.g.*, *BNSF Railway Co. – Temporary Trackage Rights Exemption – Union Pacific Railroad Co.*, STB No. FD 35963, 2015 WL 9241562, at *1 (Dec. 11, 2015) (granting partial revocation of an exemption because it would "promot[e] RTP policy goals"); *South Plains Switching, Ltd. – Acquisition Exemption – BNSF Railway Co.*, STB No. FD 33753, 2006 WL 2644250, at *2 (Sept. 14, 2006) (revocation is appropriate if STB finds that "regulation is necessary to carry out the rail transportation policy of 49 U.S.C. [§] 10101" or "to ensure the integrity of the Board's processes").

*Finally*, the Board's prior-authorization rule is inconsistent with the statutory and regulatory scheme more generally. The Board's concern that applying the corporate-family exemption where control has not been previously authorized would hamper public transparency because it would result in control without a full application process is true of *all* the exemptions. For instance, 49 C.F.R. § 1180.2(d)(1) exempts from an application the "[a]cquisition of a line of railroad which would not constitute a major market extension where the Board has found that the public convenience and

- 54 -

necessity permit abandonment." But the entire point of exemptions, which Congress has required the Board to use "to the maximum extent," 49 U.S.C. § 10502, is to avoid the "cumbersome regulatory procedures" of a full application. *Snohomish County*, 954 F.3d at 294 (citation omitted). Adding ad hoc requirements inconsistent with existing regulations contravenes the statutory and regulatory regime Congress and the agency have established.

> **2.    The STB's justifications lack merit, and its interpretation of the corporate-family-exemption regulation is not entitled to deference.**

The STB's justifications for and likely defenses of its interpretation of the corporate-family-exemption regulation lack merit.

**a.**    The STB cannot use purposive arguments to override the text of the regulation. As discussed, when text is unambiguous, an agency cannot resort to purpose to change its meaning. *See, e.g.*, *Landstar Express*, 569 F.3d at 498; *see supra* pp. 43-45. And here, there is no relevant ambiguity. As explained, the corporate-family-exemption regulation sets out a list of conditions for its application, and there is no prior-authorization requirement. In short, the STB has no textual hook for its prior-authorization requirement. Indeed, the STB *concedes* as much when it spins out its purposive argument that the text of the regulation would "allow the corporate

- 55 -

family exemption to effectively nullify other Board requirements." Decision 16 (JA__). That policy concern—which is unfounded in any event for the reasons discussed above, *supra* pp. 51-55—doesn't give the STB a license to "rewrite a [regulation's] plain text to correspond to its supposed purposes," *Landstar Express*, 569 F.3d at 498.

**b.** The STB may try to defend its new prior-authorization rule by claiming its interpretation of the corporate-family-exemption regulation is entitled to deference. That argument fails.

*First*, the regulation is not "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2415. As discussed, there is only "one reasonable construction" of the regulation, so the Court "has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Id.*

*Second*, even if the regulation were ambiguous, that "is necessary but not sufficient for [the court] to afford deference." *National Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020). Here, deference is unwarranted because the STB's interpretation of its rule does not reflect the agency's "fair and considered judgment." *Kisor*, 139 S. Ct. at 2417 (citation omitted). As discussed below, the STB's reasoning in defending its prior-authorization rule consisted only of policy justifications not specific to the corporate-family

exemption. Those conclusory rationales hardly reflect considered judgment. And the Board has never advanced the categorical rule that it announced and imposed on Norfolk Southern. Parties like Norfolk Southern, who have relied on the corporate family exemption to acquire control, will now be vulnerable to having those transactions unwound under the Board's new interpretation. The Board's new categorical rule has the potential to "impose retroactive liability on parties for longstanding conduct that the agency had never before addressed." *Id.* at 2418.

**c.** The *Kisor* analysis exposes another problem with the agency's interpretation, further confirming that it cannot be applied to the 1991 and 1998 corporate-family exemptions. As discussed, in purporting to interpret the corporate-family-exemption regulation, the STB added a new requirement of prior authorization, thus stating a new rule, rather than interpreting the regulation. *See supra* pp. 50-51. It then applied that new rule retroactively to Norfolk Southern's 1991 and 1998 exemptions. That approach violated the APA for yet another reason: Agencies have power to create rules of only *prospective* effect. *See* 5 U.S.C. § 551(4) (defining rule as an agency statement of "future effect"). As Justice Scalia explained, agency action can constitute a "rule" only if it has "legal consequences only for the future." *Bowen*, 488 U.S.

- 57 -

at 216 (Scalia, J., concurring). Thus, this Court and others have invalidated purported rules that attached to pre-promulgation, rather than to exclusively post-promulgation, conduct. *E.g.*, *id.* at 215-16; *National Mining Ass'n v. United States Dep't of the Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999); *Rock of Ages Corp. v. Secretary of Lab.*, 170 F.3d 148, 158-59 (2d Cir. 1999); *United States v. AMC Ent., Inc.*, 549 F.3d 760, 770 (9th Cir. 2008). And here, the STB's 2022 rule attaches potential antitrust and other legal consequences to 1991 and 1998 transactions and conduct that, under application of the rule in effect before 2022, would have been immune. The point is that the STB's prior-authorization rule doesn't work as an interpretation of the existing corporate-family-exemption regulation (and the one in effect in 1991 and 1998), and the agency cannot defend it as a new requirement, either.

### C.    The STB's rulings on the 1991 and 1998 corporate-family exemptions are arbitrary and capricious because the Board did not supply a reasoned explanation for its decisions.

The STB's rejection of Norfolk Southern's arguments about the 1991 and 1998 corporate-family exemptions is arbitrary and capricious because the agency failed to explain its reasoning.

*First*, the Board failed to connect the prior-authorization rule—the basis for its decision on the 1991 and 1998 exemptions—to the text of the

corporate-family exemption. As discussed, the prior-authorization rule is incompatible with the regulation. *See supra* pp. 49-55. Apart from that substantive problem, however, the Board made no effort to explain why its newly announced rule and the regulatory text were consistent. Instead, it merely decreed that its regulation contained an "implicit" requirement based on nothing more than its policy views, recognizing that without such an implicit requirement, Norfolk Southern must be right. *See* Decision 16 (JA__). That won't do. An agency cannot "whistle past the graveyard," ignoring an important aspect of the problem. *Mozilla Corp. v. FCC*, 940 F.3d 1, 66–67 (D.C. Cir. 2019) (per curiam). And here the most important problem is the text of the very regulation the Board was purporting to construe. But the STB give no reasoned explanation for its categorical rule, instead merely intoning conclusory policy rationales.

*Second*, the STB didn't connect its policy concerns, purportedly rooted in statutes and regulations, with the prior authorization rule it adopted. The agency made only conclusory assertions that policy concerns warranted the rule. But as Norfolk Southern has explained, *see supra* pp. 51-55, the statutory and regulatory regime already accounts for those concerns. The agency failed to explain how those relevant factors—both its concerns and existing

aspects of the statutory and regulatory scheme—supported the approach it adopted. That failure, too, makes the Board's adoption of the prior-authorization rule arbitrary and capricious. *See Carlson*, 938 F.3d at 343-45.

### D. The Court should vacate and remand for the STB to reconsider its rulings on the 1991 and 1998 corporate-family exemptions.

The Court should vacate the STB's rulings on the 1991 and 1998 corporate-family exemptions and remand for the STB to reconsider Norfolk Southern's arguments. When this court grants a petition for review and finds that an agency reached its decision in violation of the APA, it ordinarily vacates and remands the decision to the agency. *See, e.g.*, *Akzo Nobel Salt, Inc. v. Federal Mine Safety & Health Rev. Comm'n*, 212 F.3d 1301, 1305 (D.C. Cir. 2000). And that relief is appropriate here. The STB's prior-authorization rule is an unlawful construction of its regulations, and the agency also failed to reasonably explain why it took that approach in the first place.

The agency may resist vacatur on the ground that it would reach the same result for some reason the Board did not actually discuss in its decision. But the rule, of course, is that the Court must look only to the agency's basis for its actual decision. A reviewing court "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is not the role of the court to divine a rationale in "the tea leaves of the Board's opinion." *Jost*, 194 F.3d at 88. The uncertainty about what the Board would do is enough to warrant remand. The STB failed to adequately explain its decision the first time around, and so vacatur and remand is necessary for the agency to explain why it took the approach it did.

In any event, the case for vacatur and remand here is far stronger, because the STB's decision "is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all." *Northern Air Cargo v. United States Postal Serv.*, 674 F.3d 852, 860-61 (D.C. Cir. 2012); *Fisher v. Pension Benefit Guar. Corp.*, 994 F.3d 664, 669 (D.C. Cir. 2021). As explained, the agency's prior-authorization rule is inconsistent with the corporate-family-exemption regulation. *Supra* pp. 49-55. Thus, no matter how hard the agency tries to explain *why* it adopted the prior-authorization rule, that rule is an impermissible construction of the corporate-family regulation. Perhaps the agency will decide to initiate notice-and-comment rulemaking, or even try to declare a rule of prospective effect in a decision on remand. Either way, though, it cannot apply the prior-authorization rule to the 1991 and 1998 corporate-family exemptions.

What's more, there are serious doubts as to whether the agency can justify its decision not to recognize the 1991 and 1998 transactions as approving Norfolk Southern's control over Belt Line on some other ground instead. The 1991 and 1998 transactions meet the textual requirements of the corporate-family exemption, and they also promote its purpose.

*First*, the transactions were "within a corporate family." 49 C.F.R. § 1180.2(d)(3). In 1991, the ICC granted the exemption for Southern to directly control Norfolk and Western railroad. Southern and Norfolk and Western were part of the same corporate family. *Supra* pp. 14-16. In 1998, the STB granted the exemption for Norfolk and Western to merge into Norfolk Southern Railroad (formerly known as Southern). Norfolk and Western and Norfolk Southern Railroad were part of the same corporate family. *Supra* pp. 16-17.

*Second*, the transactions did not "result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family." 49 C.F.R. § 1180.2(d)(3). No party questioned the exemptions' application. Nor has any party sought to revoke the exemptions over the last three decades. As this Court has recognized, "it is incumbent 'upon an interested person to act affirmatively to

protect himself' in administrative proceedings" rather than "sit back and wait until all interested persons who do so act have been heard, and then complain that he has not been properly treated.'" *Nader v. Nuclear Regul. Comm'n*, 513 F.2d 1045, 1054 (D.C. Cir. 1975) (citation omitted).

*Finally*, the Board's own account of the purposes of the corporate-family exemption support Norfolk Southern's position, too. The STB's concern that the exemption could prevent regulated parties from realizing that control was granted rings hollow here. The public filings lay out the percentages of control over Belt Line exercised by all of the subsidiaries. Moreover, CSX—a sophisticated party—understood the control authority, as its 1983 agreement with Norfolk Southern and its subsequent actions accepting Norfolk Southern's power to control Belt Line show.

## CONCLUSION

The Court should vacate the STB's rulings as to the 1991 and 1998 corporate-family exemptions and remand to the STB for further consideration.

Dated: January 13, 2023

Respectfully submitted,

*/s/ Shay Dvoretzky*

William A. Mullins
Crystal M. Zorbaugh
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
  Ste. 300
Washington, DC 20037
wmullins@bakerandmiller.com
czorbaugh@bakerandmiller.com

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com
priderlo@skadden.com
steven.marcus@skadden.com
hanaa.khan@skadden.com

*Counsel for Petitioner Norfolk Southern Railway Co.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 12,998 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: January 13, 2023              Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioner*
 *Norfolk Southern Railway Co.*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(b) and Circuit Rule 25(f), I hereby certify that on January 13, 2023, I electronically filed the foregoing brief and following addendum with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and the CM/ECF system will accomplish service.

Dated: January 13, 2023          Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioner*
 *Norfolk Southern Railway Co.*

[This page intentionally left blank.]

# INDEX OF ADDENDUM

**Page**

5 U.S.C. § 706. Scope of review ........................................................... 69

28 U.S.C. § 1336. Surface Transportation Board's orders ................................. 69

28 U.S.C. § 2321. Judicial review of Board's orders and decisions;
    procedure generally; process .................................................. 70

28 U.S.C. § 2342. Jurisdiction of court of appeals ...................................... 70

49 U.S.C. § 10502. Authority to exempt rail carrier transportation ............... 71

49 U.S.C. § 11321. Scope of authority ..................................................... 71

49 C.F.R. § 1180.2. Types of transactions. ............................................... 72

49 C.F.R. § 1180.4. Procedures. ........................................................... 74

# ADDENDUM

**5 U.S.C. § 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

…

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

…

**28 U.S.C. § 1336. Surface Transportation Board's orders**

…

(b) When a district court or the United States Court of Federal Claims refers a question or issue to the Surface Transportation Board for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend,

in whole or in part, any order of the Surface Transportation Board arising out of such referral.

…

**28 U.S.C. § 2321. Judicial review of Board's orders and decisions; procedure generally; process**

(a) Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Surface Transportation Board shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.

…

**28 U.S.C. § 2342. Jurisdiction of court of appeals**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

…

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

…

**49 U.S.C. § 10502. Authority to exempt rail carrier transportation**

(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Board under this part, the Board, to the maximum extent consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the Board finds that the application in whole or in part of a provision of this part—

(1) is not necessary to carry out the transportation policy of section 10101 of this title; and

(2) either—

(A) the transaction or service is of limited scope; or

(B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.

…

**49 U.S.C. § 11321. Scope of authority**

(a) The authority of the Board under this subchapter is exclusive. A rail carrier or corporation participating in or resulting from a transaction approved by or exempted by the Board under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises

- 71 -

acquired through the transaction without the approval of a State authority. A rail carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction. However, if a purchase and sale, a lease, or a corporate consolidation or merger is involved in the transaction, the carrier or corporation may carry out the transaction only with the assent of a majority, or the number required under applicable State law, of the votes of the holders of the capital stock of that corporation entitled to vote. The vote must occur at a regular meeting, or special meeting called for that purpose, of those stockholders and the notice of the meeting must indicate its purpose.

…

## 49 C.F.R. § 1180.2. Types of transactions.

Transactions proposed under 49 U.S.C. 11323 involving more than one common carrier by railroad are of four types: *Major*, *significant*, *minor*, and *exempt*.

…

(d) A transaction is exempt if it is within one of the nine categories described in paragraphs (d)(1) through (9) of this section. The Board has found that its prior review and approval of these transactions is not necessary to carry out the rail transportation policy of 49 U.S.C. 10101; and is of limited scope or unnecessary to protect shippers from market abuse. See 49 U.S.C. 10502. A notice must be filed to use one of these class exemptions. The procedures are set out in §1180.4(g). These class exemptions do not relieve a carrier of its statutory obligation to protect the interests of employees. See 49 U.S.C. 10502(g) and 11326. The enumeration of the following categories of transactions as exempt does not preclude a carrier from seeking an exemption of specific transactions not falling into these categories.

…

(3) Transactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family.

…

**49 C.F.R. § 1180.4. Procedures.**

…

(g) ***Notice of exemption.***

(1) To qualify for an exemption under § 1180.2(d), a railroad must file a verified notice of the transaction with the Board. Except for verified notices filed under § 1180.2(d)(9), all verified notices under § 1180.2(d) must be filed at least 30 days before the transaction is consummated, indicating the proposed consummation date. Verified notices filed under § 1180.2(d)(9) will become effective upon service of notice of the transaction by the Board. Before a verified notice is filed, the railroad shall obtain a docket number from the Board's Section of Administration, Office of Proceedings.

(i) All notices filed under § 1180.2(d) shall contain the information required in § 1180.6(a)(1)(i) through (iii), (a)(5) and (6), and (a)(7)(ii), and indicate the level of labor protection to be imposed.

(ii) Notices filed under §§ 1180.2(d)(7), 1180.2(d)(8), or 1180.2(d)(9) shall also contain the following information:

(A) The name of the tenant railroad;

(B) The name of the landlord railroad;

- 74 -

(C) A description of the trackage rights, including a description of the track. For notices under § 1180.2(d)(8) and (9), the notice must state that the trackage rights are overhead rights. For notices under § 1180.2(d)(7), the notice must state whether the trackage rights are local or overhead;

(D) The date the trackage rights transaction is proposed to be consummated;

(E) The date temporary trackage rights will expire, if applicable; and

(F) For notices under § 1180.2(d)(9), a description of the situation resulting in the outage in sufficient detail to allow the Board to determine an emergency exits, including, to the extent possible, the nature of the event that caused the unforeseen outage, the location of the outage, the date that the emergency situation occurred, the date the outage was discovered, and the expected duration of the outage.

(iii) Except for notices filed under § 1180.2(d)(9), the Board shall publish a notice of exemption in the FEDERAL REGISTER within 16 days of the filing of the notice. For notices filed under § 1180.2(d)(9),

the Board shall serve a notice of exemption on parties of record within 5 days after the verified notice of exemption is filed and shall publish that notice in the FEDERAL REGISTER. The publication of notices under § 1180.2(d) will indicate the labor protection required.

(iv) If the notice contains false or misleading information that is brought to the Board's attention, the Board shall summarily revoke the exemption for that carrier and require divestiture.

(v) The filing of a petition to revoke under 49 U.S.C. 10502(d) does not stay the effectiveness of an exemption. Except for notices filed under § 1180.2(d)(9), stay petitions must be filed at least 7 days before the exemption becomes effective. For notices filed under § 1180.2(d)(9), stay petitions should be filed as soon as possible before the exemption becomes effective.

(vi) Other exemptions that may be relevant to a proposal under this provision are codified at 49 CFR part 1150, subpart D, which governs transactions under 49 U.S.C. 10901.

(2) Some transactions may be subject to environmental review pursuant to the Board's environmental rules at 49 CFR part 1105.

(3)(i) Except for notices filed under §§ 1180.2(d)(7), 1180.2(d)(8), or 1180.2(d)(9), the filing party must certify whether a proposed acquisition or operation of a rail line involves a provision or agreement that may limit future interchange with a third-party connecting carrier, whether by outright prohibition, per-car penalty, adjustment in the purchase price or rental, positive economic inducement, or other means ("interchange commitment"). If such a provision or agreement exists, the following additional information must be provided (the information in paragraphs (g)(4)(i)(B), (D), and (G) of this section may be filed with the Board under 49 CFR 1104.14(a) and will be kept confidential without need for the filing of an accompanying motion for a protective order under 49 CFR 1104.14(b)):

(A) The existence of that provision or agreement and identification of the affected interchange points; and

(B) A confidential, complete version of the document(s) containing or addressing that provision or agreement;

(C) A list of shippers that currently use or have used the line in question within the last two years;

- 77 -

(D) The aggregate number of carloads those shippers specified in paragraph (g)(4)(i)(C) of this section originated or terminated (confidential);

(E) A certification that the filing party has provided notice of the proposed transaction and interchange commitment to the shippers identified in paragraph (g)(4)(i)(C) of this section;

(F) A list of third party railroads that could physically interchange with the line sought to be acquired or leased;

(G) An estimate of the difference between the sale or lease price with and without the interchange commitment (confidential);

(H) A change in the case caption so that the existence of an interchange commitment is apparent from the case title.

(ii) To obtain information about an interchange commitment for use in a proceeding before the Board, a shipper or other affected party may be granted access to the confidential documents filed pursuant to § 1180.4(g)(4)(i) of this section by filing, and serving upon the petitioner, a "Motion for Access to Confidential Documents," containing:

(A) An explanation of the party's need for the information; and

(B) An appropriate draft protective order and confidentiality undertaking(s) that will ensure that the documents are kept confidential.

(iii) *Deadlines.*

(A) Replies to a Motion for Access are due within 5 days after the motion is filed.

(B) The Board will rule on a Motion for Access within 30 days after the motion is filed.

(C) Parties must produce the relevant documents within 5 days of receipt of a Board approved, signed confidentiality agreement.

…