[Oral Argument Not Yet Scheduled]

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————

No. 22-1209

———————————————————

NORFOLK SOUTHERN RAILWAY COMPANY,
*Petitioner,*

v.

SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA,
*Respondents*

———————————————————

## BRIEF OF RESPONDENTS

———————————————————

JONATHAN KANTER
Assistant Attorney General

ROBERT B. NICHOLSON
ROBERT J. WIGGERS
Attorneys
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

CRAIG M. KEATS
General Counsel

ANIKA SANDERS COOPER
Deputy General Counsel

LAURA M. WILSON
Attorney

Surface Transportation Board
395 E Street SW
Washington, DC 20423-0001
(202) 245-0275
laura.wilson@stb.gov

February 6, 2023

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

**Parties**

The parties to this proceeding are Norfolk Southern Railway Company (Petitioner), the Surface Transportation Board (Respondent), the United States of America (Respondent), and CSX Transportation, Inc. (Intervenor). The parties to the proceeding below were Norfolk Southern, CSX, and Norfolk & Portsmouth Belt Line Railroad Company (the Belt Line).

**Ruling under review**

Norfolk Southern challenges part of the Board's declaratory order in *Norfolk Southern Railway Co.*, Docket No. FD 36522, 2022 WL 2191932 (STB served June 17, 2022).

**Related cases**

The Board issued its order in *Norfolk Southern* upon a referral by the United States District Court for the Eastern District of Virginia in *CSX Transportation, Inc. v. Norfolk Southern Railway Co.*, No. 2:18-cv-00530, Order and Opinion (E.D. Va. May 18, 2021). Norfolk Southern has raised its challenge to the Board's order both in this Court and through a complaint to the Eastern District of Virginia. *See Norfolk Southern Railway Co. v. STB*, No. 2:22-cv-00385-EWH-LRL (E.D. Va.).

<u>**T**ABLE OF **C**ONTENTS</u>

<u>Page</u>

INTRODUCTION ......................................................................1

JURISDICTION.......................................................................2

STATEMENT OF ISSUES ........................................................2

STATUTES AND REGULATIONS............................................3

STATEMENT OF THE CASE....................................................3

    1.   Regulatory framework .....................................................3

    2.   The dispute in district court ............................................5

    3.   The district court's referral .............................................6

    4.   Norfolk Southern's immunity arguments to the Board ...............7

    5.   The Board's order ........................................................9

    6.   Norfolk Southern's challenge .........................................11

    7.   Further developments...................................................11

SUMMARY OF ARGUMENT ....................................................12

    1.   Jurisdiction ...............................................................12

    2.   Merits ....................................................................13

STANDARD OF REVIEW .......................................................14

ARGUMENT .......................................................................14

    I.   THE DISTRICT COURT HAS EXCLUSIVE JURISDICTION
        TO REVIEW THE BOARD'S ORDER. ....................................14

    II.  NORFOLK SOUTHERN DID NOT CURE ITS UNAUTHORIZED
        ACQUISITION OF CONTROL BY OBTAINING EXEMPTIONS
        FOR SUBSEQUENT, INTERNAL REORGANIZATIONS. ......................21

        A.   The internal reorganizations, by their nature, could not have
           given rise to the requisite authorization.................................21

        B.   Norfolk Southern's administrative law arguments
           are unfounded. ..........................................................25

CONCLUSION ....................................................................28

ADDENDUM – Statutes and Regulations

## TABLE OF AUTHORITIES

Page

**Cases**

*Greater Boston Television Corp. v. Fed. Commc'n. Comm'n*,
444 F.2d 841 (D.C. Cir. 1970) ............................................................28

*McCarty Farms, Inc. v. Burlington Northern, Inc.*,
787 F. Supp. 937 (D. Mont. 1992)......................................................19

*McCarty Farms, Inc. v. Surface Transp. Bd.*,
158 F.3d 1294 (D.C. Cir. 1998) ....................................... 13, 15, 19-20

*North Carolina v. Fed. Ener. Reg. Comm'n*,
913 F.3d 148 (D.C. Cir. 2019) ............................................................14

*R.R. Salvage & Restoration, Inc. v. Surface Transp. Bd.*,
648 F.3d 915 (8th Cir. 2011).......................................................... 17, 18

*Railway Labor Executives' Ass'n v. ICC*,
894 F.2d 915 (7th Cir. 1990) ..............................................................15

*United Pacific Railroad Co. v. Ametek, Inc.*,
104 F.3d 558 (3d Cir. 1997)................................................................17

*Vill. of Palestine v. Interstate Commerce Comm'n*,
936 F.2d 1335 (D.C. Cir. 1991) ............................................................4

**Agency Decisions**

*Norfolk Southern Corp.*, 366 I.C.C. 173 (1982) ........................................6

*Norfolk S. Ry.*, STB Docket No. FD 33648, 63 Fed. Reg. 46278-01,
1998 WL 546005 (Aug. 31, 1998)..........................................................8

*Norfolk Southern Railway Co.*, Docket No. FD 36522
(STB served June 17, 2022)................................... 10, 22, 23, 24, 26-28

*Riffin—Acquis. & Operation Exemption—in York Cnty., Pa.*,
Docket No. FD 36548 (STB served Apr. 21, 2022) ..............................5

*San Jacinto Transportation Co., Inc.—Operation Exemption—*
    *SJRE-Railroad Series*, Docket No. 35996, 2022 WL 331236
    (STB served Feb. 2, 2022) ...................................................................23

*S. Ry.*, ICC Docket No. FD 31791, 56 Fed. Reg. 1541-03,
    1991 WL 310251 (Jan. 15, 1991) ..........................................................8

**Statutes**

5 U.S.C. § 706(2)(A) ...............................................................................14

28 U.S.C. § 1336(b) ................................................................ 12, 14, 19-20

49 U.S.C. § 10501 .....................................................................................3

49 U.S.C. § 10502 .....................................................................................4

49 U.S. § 11321............................................................... 3, 6, 16, 21

49 U.S.C. § 11323 .............................................................. 4, 21-22

49 U.S.C. § 11324(d) ...............................................................................22

49 U.S.C. § 10102(3) .................................................................................4

Pub. L. No. 104-88....................................................................................3

**Regulations**

49 C.F.R. § 1180.2(d)(3)................................................................5, 21, 25-27

49 C.F.R. §§ 1180.4 ..............................................................................4, 5

49 C.F.R. § 1180.6(a)(1)......................................................................3, 23

49 C.F.R. Part 1201, Subpart A (ii)(5)(b) .................................................4

**Other Authorities**

S. Rep. No. 1394, 88th Cong., 2d Sess. 2 (1964),
    U.S. Code Cong. & Admin. News 1964 ...............................................15

S. Rep. No. 1499, 90th Cong., 2d Sess. 2 (1968). ...................................15

## INTRODUCTION

Norfolk Southern's petition for review rests on errors both jurisdictional and substantive. First, under 28 U.S.C. § 1336(b), jurisdiction to review the Board's order lies exclusively with the referring district court. Each Board determination flowed from the question that the district court's referral posed. And each determination is relevant to the key district court issue of whether prior agency actions immunize Norfolk Southern from CSX's antitrust claims there. The fact that the district court, in articulating the immunity issue to the Board, did not anticipate an argument subsequently raised at and decided by the Board does not, as Norfolk Southern claims, divest the district court of jurisdiction. Such a result would override the plain meaning of the phrase "arising out of" in section 1336(b) and would pointlessly divide and protract litigation. Thus, in the Third and Eighth Circuits in a situation like this, review of the Board's entire order is in the district court. And the law in this Circuit is not to the contrary, notwithstanding Norfolk Southern's reliance – out of context – on a different sort of case.

Second, there is no merit to Norfolk Southern's argument that, even if the Board did not authorize it to control the Belt Line when it authorized control of other railroad properties in a transaction approved in 1982, the Board subsequently granted such authorization in decisions authorizing merely ministerial reorganizations of the Norfolk Southern corporate family. As the Board found,

Norfolk Southern did not, in those later corporate family proceedings, even name or otherwise identify the Belt Line, let alone seek authorization to control the Belt Line or provide the requisite information on the competitive impact of a Belt Line acquisition. Thus, the Board correctly ruled that it had never authorized Norfolk Southern to control the Belt Line and thus never activated the statutory antitrust immunity such approval would provide.

## JURISDICTION

Norfolk Southern challenges a portion of the Board's order in *Norfolk Southern Railway Co.*, Docket No. FD 36522, 2022 WL 2191932, Decision (STB served June 17, 2022) . The Board issued the order upon a referral by the district court in *CSX Transportation, Inc. v. Norfolk Southern Railway Co.*, No. 2:18-cv-00530, Order and Opinion (E.D. Va. May 18, 2021). The Board's entire order arose out of the referral and therefore, under 28 U.S.C. § 1336(b), is subject to review only by the district court.

## STATEMENT OF ISSUES

1.    Whether, under 28 U.S.C. § 1336(b), the district court rather than this Court has jurisdiction to review the Board order issued in response to the district court's referral.

2.    Whether the Board reasonably found that the agency did not authorize Norfolk Southern to acquire control over the Belt Line when it authorized, by

exemption, two ministerial corporate transactions that did not even mention the Belt Line.

## STATUTES AND REGULATIONS

Except for the following, all applicable statutes and regulations are contained in the Brief for Petitioner: 49 U.S.C. § 10501, 49 U.S.C. § 11323, 49 U.S.C. § 11324, 49 U.S.C. § 10102(3), 49 C.F.R. Part 1201, Subpart A (ii)(5)(b), and 49 C.F.R. § 1180.6(a)(1). These statutes and regulations are included in the addendum hereto.

## STATEMENT OF THE CASE

### 1.     **<u>Regulatory framework</u>**

The Board, like its predecessor the Interstate Commerce Commission,[1] has exclusive jurisdiction over interstate rail transportation, including authority over acquisitions of control of a railroad. *See* 49 U.S.C. § 10501. Authorization of control gives the involved railroads certain antitrust immunity in carrying out the transaction and exercising control. 49 U.S.C. §§ 11321(a). In deciding whether to authorize a proposed acquisition of control, the Board must consider, among other things, whether the acquisition would adversely affect competition. 49 U.S.C.

---

[1] In the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, Congress abolished the Interstate Commerce Commission, modified the governing statute (the Interstate Commerce Act), and transferred the ICC's remaining rail regulatory functions to the newly established Surface Transportation Board.

§§ 11323 and 11324 (formerly codified at 49 U.S.C. §§ 11343 and 11344). In assessing whether a company would acquire control over a railroad, the Board considers interests that the company would hold directly as well as interests that the company would hold indirectly through affiliates. *See* 49 U.S.C. § 10102(3); 49 C.F.R. Part 1201, Subpart A (ii)(5)(b).

The Board's regulations establish formal procedures for considering proposed acquisitions of control, procedures that accommodate different levels of review based on the significance of the acquisition at hand. 49 C.F.R. §§ 1180.4(a)-(f). The Board's regulations also establish procedures for obtaining exemption from formal procedures under 49 U.S.C. § 10502.

An exemption does not mean that the transaction is unregulated. Rather, section 10502 provides a streamlined process for authorization when the agency finds that a full regulatory proceeding is unnecessary. 49 U.S.C. § 10502. In addressing an exemption request under the criteria of section 10502, the agency looks to the purpose of the underlying provision (here, 49 U.S.C. §§ 11323 and 11324) from which the exemption is sought. *Vill. of Palestine v. Interstate Commerce Comm'n*, 936 F.2d 1335, 1338-39 (D.C. Cir. 1991) (citations omitted).

Transactions that qualify for a "class exemption" are subject to even more streamlined "notice" procedures. A transaction is eligible for a class exemption when the transaction is of a type that the Board has found does not implicate

competitive or other regulatory concerns. *Riffin—Acquis. & Operation Exemption—in York Cnty., Pa.*, Docket No. FD 36548, 2022 WL 1198614, Decision at 6-7 (STB served Apr. 21, 2022) (class exemption applies to transactions that ordinarily require minimal scrutiny). Here, the relevant class exemption is that for corporate family transactions. It may be used for a transaction that takes place within a corporate family, when the transaction would not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family. 49 C.F.R. § 1180.2(d)(3). In the Board's "notice" procedures for class exemptions, a party must describe the transaction for which exemption is sought and provide a verified statement attesting that the transaction meets standards for exemption (including, in the case of a corporate family transaction, that the transaction would not change the competitive balance). 49 C.F.R. § 1180.4(g).

## 2.    <u>The dispute in district court</u>

In 2018, CSX Transportation, Inc. filed an antitrust action against Norfolk Southern and a small railroad called the Belt Line (formally named the Norfolk & Portsmouth Belt Line Railroad Company). *CSX Transportation*, E.D. Va., No. 2:18-cv-00530, Complaint at 4 (Joint Appendix (J.A.) __). Since 1982, Norfolk Southern's corporate family has held a 57 percent ownership interest in the Belt Line, with CSX (Norfolk Southern's competitor) owning the remaining

43 percent. CSX's complaint alleged that Norfolk Southern anticompetitively used its influence over the Belt Line in violation of federal antitrust laws and related state laws. *Id.* (J.A. __).

Norfolk Southern moved to dismiss, asserting that, under 49 U.S. § 11321, the company has antitrust immunity in exercising control over the Belt Line. *CSX Transportation*, Brief in Support of Motion to Dismiss at 8, 9-10 (Jan. 30, 2020) (J.A. __). Norfolk Southern argued to the district court that it had secured immunity from antitrust laws under the predecessor to section 11321(a) in 1982, when the ICC approved a merger between Norfolk Southern (then named Southern Railway Company) and a previously unaffiliated railroad (Norfolk and Western Railway Company). *See Norfolk Southern Corp.*, 366 I.C.C. 173, 1982 WL 28414 (1982). That merger brought, for the first time, a majority of the ownership interests in the Belt Line within a single corporate family: Norfolk Southern's corporate family.

### 3.    <u>The district court's referral</u>

The district court expressed reservations about Norfolk Southern's claim of immunity. *CSX Transportation*, Opinion and Order at 3 (J.A. __). In part, the court expressed skepticism that the ICC's approval of the 1982 merger included authorization to acquire control over the Belt Line, noting that, in the associated applications, no mention was even made of acquiring control over the Belt Line.

- 6 -

*Id.* at 10. The court did, however, refer the antitrust immunity issue to the Board, considering the Board's special expertise in railroad mergers. *Id.* at 3, 25-26. The court articulated the referral with reference to the 1982 merger, consistent with the fact that Norfolk Southern had presented only the ICC's approval of that merger as an alleged basis for immunity. *Id.* at 29.

4.    **Norfolk Southern's immunity arguments to the Board**

Most of Norfolk Southern's case in the Board proceeding on referral focused on the 1982 transaction. But Norfolk Southern also presented two additional transactions (in 1991 and 1998) as alleged bases for the company's claim of immunity in *CSX Transportation*. At the time of the two transactions, Norfolk Southern had described them as involving merely the internal reorganization of Norfolk Southern's corporate family. And so, in each case, it had sought a corporate family exemption.

The company's notice of exemption for the 1991 internal reorganization indicated in a sworn statement that the transaction would affect only rail carriers that were "already commonly controlled and operated as part of a corporate family." *S. Ry.—Control Exemption—Norfolk and Western Railway Co. Chesapeake Western Railway, the Toledo Belt Railway Co., and Wabash Railroad Co.*, STB Docket No. FD 31791, Notice of Exemption at 7 (Dec. 14, 1990) (J.A. __). The company's notice of exemption for the 1998 internal reorganization

likewise did not suggest that there would be any acquisition of control. To the contrary, the notice indicated that there would be merely a nominal change in ownership of the affected railroads. Neither the 1991 notice nor the 1998 notice suggested that the reorganization might change the competitive balance, as that would have vitiated the exemption. *See also Norfolk S. Ry.—Exemption—Norfolk & W. Ry.*, ICC Docket No. FD 33648, Notice of Exemption (Aug. 13, 1998) (J.A. __). The agency, based on Norfolk Southern's sworn representations, exempted both internal reorganizations from formal review procedures. *S. Ry.*, ICC Docket No. FD 31791, 56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991) (J.A. __); *Norfolk S. Ry.*, STB Docket No. FD 33648, 63 Fed. Reg. 46278-01, 1998 WL 546005 (Aug. 31, 1998) (J.A. __). Decades later, in the Board's proceedings on referral, Norfolk Southern took a very different view of the 1991 and 1998 proceedings. Contrary to everything it had said earlier, Norfolk Southern now argues, first, that the exemptions of the internal reorganizations "placed" the Belt Line under the company's "direct control" and, second, that this alleged authorization conferred on Norfolk Southern immunity from antitrust laws. *Norfolk Southern*, Opening Statement of Norfolk Southern at 4, 13-17 (Sept. 23, 2021) (J.A. __).

Norfolk Southern has also changed its tune in another important respect. Contrary to the position it takes before this Court, Norfolk Southern argued in the

Board's proceedings on referral that consideration of the internal reorganizations fell within the scope of the district court's referral, which focused on authorization of control and conferral of antitrust immunity. *Id.* at 2, n.1. Norfolk Southern presented the internal reorganizations as within the district court's referral, and responsive to the question the district court had asked, because, it said, they were part of a series of transactions (beginning with the 1982 merger) that purportedly led to Norfolk Southern's alleged authorization to control the Belt Line in a way that provided antitrust immunity. *See, e.g.*, *id.* at 4 ("The 1982 transaction and subsequent transactions unequivocally authorized [Norfolk Southern Corporation] to exercise control over both [the Belt Line] and [Norfolk Southern]."). *See also id.* at 15 (Because "[Norfolk Southern Corporation] was given indirect control over [the Belt Line] and [Norfolk Southern] was given direct control over [the Belt Line] as a result of the 1998 transaction[,] the answer to the Court's question is an unequivocal 'yes'").

## 5.     **The Board's order**

The bulk of the Board's decision focused on the 1982 transaction, as that had been the focus of Norfolk Southern's argument. The Board found that Norfolk Southern did not seek to acquire control over the Belt Line in connection with the 1982 transaction; that, to the contrary, the company indicated its intention *not* to control railroads such as the Belt Line; and, accordingly, that the ICC did not

authorize Norfolk Southern to acquire control over the Belt Line in connection with the 1982 transaction. *Norfolk Southern* at 9-15 (J.A. ___). Norfolk does not seek judicial review of that aspect of the decision in any court.

The Board similarly found that the corporate family exemptions for the 1991 and 1998 internal reorganizations did not authorize Norfolk Southern to acquire control over the Belt Line. The Board reasoned that there had been no authorization because the Belt Line had never been mentioned in the exemption proceedings. The Board further reasoned that the corporate family exemption, by its terms, applies only to transactions that do not implicate regulatory concerns, here, to the nominal changes in ownership that were said to occur through the internal reorganizations. Noting the limited reach of the corporate family exemption, the Board found that the exemptions of the internal reorganizations could not have cured the corporate family's unauthorized acquisition of control over the Belt Line in 1982. *Id.*

The Board added that Norfolk Southern's proposed interpretation of the exemptions would undermine sound regulation. Had the Belt Line been permitted through stealth to become an authorized member of Norfolk Southern's corporate family – on the theory that, in granting exemptions for the internal reorganizations, the agency ratified a previously unauthorized (and therefore unlawful) acquisition of control – the agency would never have received the information about any

- 10 -

potential change to competition in 1982 required by the statute and the regulations.

The Board concluded that to accept Norfolk Southern's proposed interpretation of

the exemptions would leave unfilled the company's obligation to demonstrate that

the 1982 acquisition of control met applicable standards and would violate the

public's right to know what authorizations and associated legal privileges are being

granted. *Id.* at 11.

### 6.    <u>Norfolk Southern's challenge</u>

Norfolk Southern challenges only the portion of the Board's order that

pertains to the two internal reorganizations of Norfolk Southern's corporate family.

<u>See</u> Petition for Review at 4. Norfolk Southern has raised that challenge both

through the company's petition for review in this Court and through a complaint to

the district court. *See Norfolk Southern Railway Co. v. STB*, No. 2:22-cv-00385-

EWH-LRL, Complaint (Sept. 15, 2022) (E.D.Va.) (J.A. __)

### 7.    <u>Further developments</u>

The district court has found that CSX's claims for damages under federal

antitrust and related state laws are time-barred. *CSX Transportation*, Opinion and

Order (January 3, 2023). The court has also found that CSX' claims for

injunctive relief under federal antitrust laws are preempted by the Board's

exclusive jurisdiction in this area. *CSX Transportation*, Opinion and Order (Jan.

27, 2023). Trial of any remaining state law claims for injunctive relief has been continued at the request of the parties.

## SUMMARY OF ARGUMENT

### 1.    <u>Jurisdiction</u>

Section 1336(b) provides that a Board "order" is to be reviewed by the referring court when that order "arose out of" the court's referral. Here, the Board's order arose out of the district court's referral. Each determination in that order flowed from the question posed by the district court, and each addressed the matter on which the district court sought the Board's guidance: whether the agency had authorized Norfolk Southern's acquisition of control over the Belt Line and conferred immunity from the pending federal antitrust and related state claims. Although Norfolk Southern brought to the Board a new argument that it had not put before the district court, Norfolk Southern told the Board at the time it made its filings that its claims concerning the 1991 and 1998 exemptions were presented to persuade the District Court to rule in its favor regarding authorization of control and thus of antitrust immunity. Under the plain language of section 1336(b), the Board's entire order is subject to review only by the district court.

Norfolk Southern's argument that the Board's treatment of the exemptions of the 1991 and 1998 internal reorganizations did *not* arise out of the district court's referral rests on a misreading of this Court's decision in *McCarty Farms,*

- 12 -

*Inc. v. Surface Transp. Bd.*, 158 F.3d 1294 (D.C. Cir. 1998). There, the Court found that a portion of a consolidated Board order addressing claims that had arisen directly before the agency, with no connection to the referring court's referral order, did not arise out of any referral. The Court's holding – that only the part of the consolidated agency order that dealt with the claims in district court should go to the district court for review – flowed naturally from the entirely different origin of the other claims. Here, in contrast, the Board's entire order dealt with Norfolk Southern's claim of immunity before the district court, the matter that was the subject of the district court's referral.

## 2.    <u>Merits</u>

There is no merit to Norfolk Southern's claim that the Board, despite not having authorized the company's acquisition of control over the Belt Line in 1982, authorized that acquisition of control *sub silentio* in exempting the 1991 and 1998 internal reorganizations from formal review. Norfolk Southern's argument is sheer boot-strapping. It is also dangerous boot-strapping. If accepted, Norfolk Southern's argument would allow the company to avoid meaningful review of its takeover of the Belt Line and could confer antitrust immunity without the regulatory scrutiny that Congress made a condition of immunity.

## STANDARD OF REVIEW

The jurisdictional issue in this matter is whether Norfolk Southern's challenge should be heard by this Court or the district court. That is a question of law, and indeed a question on which the Board did not rule. Therefore, the jurisdictional issue is one that the Court should decide *de novo*.

In contrast, whether the Board correctly interpreted its 1991 and 1998 decisions is subject to review under the Administrative Procedure Act's deferential "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). Under the "arbitrary and capricious" standard, a challenger carries a heavy burden. *North Carolina v. Fed. Ener. Reg. Comm'n*, 913 F.3d 148, 150 (D.C. Cir. 2019) (citing *Wisconsin Valley Improvement v. Fed. Ener. Reg. Comm'n*, 236 F.3d 738, 745 (D.C. Cir. 2001)).

## ARGUMENT

## I.    THE DISTRICT COURT HAS EXCLUSIVE JURISDICTION TO REVIEW THE BOARD'S ORDER.

Section 1336(b) provides for the Board's orders on referral to be reviewed by the referring court:

> When a district court or the United States Court of Federal Claims refers a question or issue to the Surface Transportation Board for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Surface Transportation Board arising out of such referral.

- 14 -

28 U.S.C. § 1336(b). The statute's broad terms "any order" and "arising out of" reflect congressional intent to establish a straightforward jurisdictional scheme: when, as here, a court refers a matter to the agency, the matter goes back to the referring court for review. S. Rep. No. 1394, 88th Cong., 2d Sess. 2 (1964); U.S. Code Cong. & Admin. News 1964 at 3235. As envisioned by Congress, only after the district court reached a final judgment would the case be subject to review by a court of appeals. S. Rep. No. 1499 at 3, 90th Cong., 2d Sess. 2 (1968).

   This approach allows the referring court to reach judgment in its case without potentially needing to wait for another court to act. U.S. Code Cong. & Admin. News 1964 at 3235. This approach also promotes judicial efficiency by reducing the number of courts that are involved in the same dispute. *Railway Labor Executives' Ass'n v. ICC*, 894 F.2d 915, 917 (7th Cir. 1990) (review by the referring court properly avoids a situation in which the courts of appeals would need to hear the same case twice: once in reviewing the agency's order and a second time in reviewing the referring court's final judgment).

   Here, it is clear that the order at issue is one "arising out of" the district court's referral. The "arising out of" standard is understood as referring to origination. *McCarty Farms*, 158 F.3d at 1299. Each determination in the Board's order below originated in the district court's referral in *CSX Transportation*. The district court indicated its broad intention to refer "the immunity issue" to the

Board, that is, to have the Board determine whether it had authorized Norfolk

Southern to acquire the Belt Line in a way that would immunize Norfolk Southern

from federal antitrust and related state law claims pending before the district court.

*See CSX Transportation*, Opinion and Order at 3, 6, 29 (J.A. __). The district court

articulated the immunity issue with reference to all of the arguments the parties had

thus far presented in connection with that issue, including the effect of the ICC's

approval of the 1982 merger and the proper interpretation of when it is necessary,

within the meaning of section 11321(a), for federal antitrust and related state laws

to yield. *Id.* at 29.

To be sure, the district court did not explicitly allude to Norfolk Southern's

argument that the agency's exemptions of the subsequent, internal reorganizations

gave Norfolk Southern regulatory authorization that would provide immunity from

federal antitrust and related state laws, but that is only because Norfolk Southern

had not yet presented that argument. But when it finally did come up with that

argument, Norfolk Southern explicitly told the Board that it was presenting it to

persuade the Board to rule, in response to the referral order, that Norfolk Southern

should have immunity in the district court's underlying antitrust case. *Norfolk*

*Southern*, Opening Statement of Norfolk Southern at 4, 13-17 (J.A. __).

Notwithstanding its current position before this Court, Norfolk Southern's

argument before the Board in this case reflects what is obvious: Norfolk

- 16 -

Southern's filings, and the Board's rulings in response, arose only out of the

district court's referral order, and the Board's decision is subject to review only by

the district court.

This conclusion is supported by *United Pacific Railroad Co. v. Ametek, Inc.*,

104 F.3d 558 (3d Cir. 1997). There, a railroad sued a shipper in district court,

seeking to recover demurrage charges that allegedly were owed by that shipper.

The district court asked the ICC to determine the reasonableness of the demurrage

charges. The agency, in its proceeding on referral, considered an argument by

the shipper that the railroad lacked authority to impose demurrage charges.

The agency's determination (that the railroad could not impose demurrage charges)

in effect invalidated the railroad's claim before the district court. The United States

Court of Appeals for the Third Circuit held that the agency's entire order arose out

of the district court's referral and therefore was subject to review only by the

district court, even though the district court had not expressly asked the agency

whether the railroad could impose demurrage charges. *Id.* at 559. The key to this

jurisdictional outcome was that the agency's entire order pertained to the dispute

before the district court. *Id.* at 562.

The United States Court of Appeals for the Eighth Circuit adopted the same

approach in *R.R. Salvage & Restoration, Inc. v. STB*, 648 F.3d 915 (8th Cir. 2011).

There, as in *Ametek*, a railroad sued a shipper in district court, seeking to recover

- 17 -

demurrage charges. The district court asked the Board to determine the reasonableness of the demurrage charges, articulating five questions that pertained to the reasonableness of those charges. The Board, in its order on referral, addressed not only those five questions but also whether the railroad lawfully could charge interest for late payment of demurrage charges. *Id.* at 917-18.

The Eighth Circuit held that the Board's entire order arose out of the district court's referral and therefore was subject to review only by the district court. *Id.* at 920. As in *Ametek*, the key was that the Board's entire order pertained to the dispute in district court. *Id.* at 921. With this in mind, the Eighth Circuit found no conflict between, on one hand, *Ametek* and *R.R. Salvage* and, on the other hand, *McCarty Farms*. The Eighth Circuit noted that, in *McCarty Farms*, the rate challenges that had been initiated before the agency amounted to a new dispute, beyond the dispute in district court. Therefore, in harmony with the outcomes in *Ametek* and *R.R. Salvage*, the Board's determinations in connection with the new dispute properly went to a circuit court for review. *Id.*

*McCarty Farms*, on which Norfolk Southern principally relies, does not demand a different outcome. There, the Board had issued a consolidated order on several rates for rail service, each pertaining to a different commodity or time period. Some of the rates had been challenged at the agency (one by a party not even involved with the court case), and some had been challenged through

a complaint in district court. 158 F.3d at 1296. The district court had referred to the agency the counts of the complaint that included the rate challenges that had been brought before it. *See McCarty Farms, Inc. v. Burlington Northern, Inc.*, 787 F. Supp. 937, 942 (D. Mont. 1992). On appeal of the agency's consolidated order addressing all of the rate challenges, including those that had nothing to do with the district court case, this Court held that the district court should review only the matters it had referred. The Court held that review of other matters, those involving rates and parties that had nothing to do with the dispute in district court, should proceed under the usual provisions governing appellate court review of the Board's decisions. 158 F.3d at 1299-1300.

Here, as we have shown, the 1991 and 1998 exemption rulings are intimately tied to the referral order and to the dispute that is pending before the district court. Those rulings responded directly to the district court's question about whether control had been authorized and whether immunity had been conferred. Unlike the unrelated rates in *McCarty Farms*, the 1991 and 1998 rulings originated in and had everything to do with the district court proceeding. Therefore, under the rationale in *McCarty Farms*, review of those rulings belongs in the district court.

Norfolk Southern incorrectly suggests that this Court in *McCarty Farms* adopted a distinct approach under section 1336(b), an approach that would depart not only from the approach taken in other circuits, but from the plain meaning of

section 1336(b) and from congressional intent. Norfolk Southern relies on the Court's statement that a circuit court reviews issues other than those that are expressly set out in the district court's referral. *See* Petitioner's Brief at 29 (citing 158 F.3d at 1300).

When that statement is read in context, it is clear that the Court used the word "issues" to refer to broad claims for relief. The Court merely sought in *McCarty Farms* to distinguish, for jurisdictional purposes, between claims that had originated in the district court and claims that had originated before the agency. To distinguish between the two sets of claims, the Court simply identified and compared the subject matters of the various claims and determined where they originated. 158 F.3d at 1298-1300. The Court did not examine whether the district court had anticipated every legal or factual argument that the parties might raise, in the agency's proceeding on referral, in connection with the claim that originated before the district court. Such an approach – which Norfolk Southern advances here – would have been inconsistent with the plain language and the intent of section 1336(b).

## II.    NORFOLK SOUTHERN DID NOT CURE ITS UNAUTHORIZED ACQUISITION OF CONTROL BY OBTAINING EXEMPTIONS FOR SUBSEQUENT, INTERNAL REORGANIZATIONS.

### A.    The internal reorganizations, by their nature, could not have given rise to the requisite authorization.

Norfolk Southern does not dispute that it was required by statute to obtain agency authorization to acquire control over the Belt Line. Nor does it dispute that, as a condition of immunity under section 11321(a), its acquisition of control must have been authorized by the agency. Finally, contrary to its position before the District Court and the Board, Norfolk Southern does not now dispute that it failed to obtain authorization to acquire control over the Belt Line in 1982. Instead, it argues that the agency's class exemptions of corporate reorganizations in 1991 and 1998 – in proceedings that never even identified the Belt Line – gave what is in effect *sub silentio* approval of control. Petitioner's Brief at 15-17, 28. The argument is plainly incorrect.

As far as the agency is concerned, the internal reorganizations were merely nominal changes in ownership. An acquisition of control is vastly different. An acquisition of control over a railroad calls for regulatory oversight in large part to make sure that the transaction does not adversely affect the competitive landscape. *See* 49 U.S.C. §§ 11323 and 11324; 49 C.F.R. § 1180.2(d)(3). As the Board recognized in its order below, careful scrutiny of the effect on competition is especially important because agency authorization of an acquisition of control

- 21 -

confers immunity from federal antitrust and related state laws under 49 U.S.C.

§ 11321(a). *Norfolk Southern* at 13-14 (J.A. __) (noting that the Board and the

public must have "a clear understanding of the scope of the authority being sought"

given the significance of antitrust immunity). Necessarily, therefore, authorization

of inconsequential changes in ownership that occur within a corporate family

cannot be a substitute for prior authorization of the corporate family's acquisition

of control.

Thus, Norfolk Southern's argument – that the requirement for separate

authorization of the prior transaction is an "ad hoc" requirement, Petitioner's Brief

at 54-55 – rests on a misapprehension of the regulatory scheme. The statute

requires that changes in control may be effected only with *prior* authorization.

49 U.S.C. § 11323. This enables the Board to address on a timely basis any adverse

impact of the proposed change in control. 49 U.S.C. § 11324(d). There is nothing

ad hoc about requiring Norfolk Southern to comply with the statute and the

regulations, and no basis for any claim that the ministerial class exemptions of the

internal reorganizations somehow authorized the company's prior, unauthorized

acquisition of control.

The exemptions of the 1991 and 1998 internal reorganizations could not

have included authorization to control the Belt Line for another and separate

reason: Norfolk Southern never clearly presented the matter for regulatory review.

- 22 -

A conclusion that the agency had authorized a control transaction it did not even know was before it would undermine transparency and effectively thwart public participation in an important matter. As the Board correctly stated: "The Board and the public must be able to clearly understand the control authority sought and granted, particularly given the significance of the immunity from antitrust laws and other laws that comes with control authority." *Norfolk Southern* at 11 (J.A. __); *see also id.* at 12-13 (J.A. __) ("Given the significance of the antitrust immunity and other immunity that comes with control authority, the Board and the public must be able to have a clear understanding of the scope of the authority being sought.").

These principles of transparency and public participation are built into the Board's regulations. Any application for formal approval or notice of exemption must include a description of all of the material aspects of the relevant transaction. *See* 49 C.F.R. § 1180.6(a)(1). A party violates this requirement when it fails to provide that description. Such a failure is one ground for the Board's practice of voiding *ab initio* certain notices of exemption. *San Jacinto Transportation Co., Inc.—Operation Exemption— SJRE-Railroad Series*, Docket No. 35996, Decision at 4, 2022 WL 331236 (STB served Feb. 2, 2022); *Norfolk Southern* at 11 (J.A. __). Thus, the notices of exemption for the 1991 and 1998 internal reorganizations – notices that made no reference to the Belt Line – could not have resulted in *sub silentio* authorization of control over the Belt Line.

- 23 -

Norfolk Southern incorrectly suggests that the agency and the public *were*
on notice that the internal reorganizations and associated exemptions would affect
the Belt Line, relying on general references to "subsidiaries" in the notices of
exemption. Petitioner's Brief at 15-17. But the Belt Line was not among the
subsidiaries that were said, in Norfolk Southern's 1991 and 1998 notices, to be
affected by the reorganizations. The notice for the 1991 internal reorganization
identified the affected subsidiaries as Southern Railway Company, Norfolk and
Western Railway Company, and Chesapeake Western Railway. *S. Ry.—Control
Exemption*, Notice of Exemption at 3 (J.A. __). There was no reference to the Belt
Line by name or by any other defining characteristic in either the 1991 notice or
the 1998 notice. In any case, as we have demonstrated, the 1991 and 1998
reorganizations involved no change in control over any railroad and therefore
could not have led to the authorization and immunity that Norfolk Southern asserts.

Finally, as the Board explained, to treat the exemptions of the internal
reorganizations as authorizing control over the Belt Line would allow the
exemption process to be used to accomplish acquisitions of control that were never
disclosed and never subjected to required statutory or regulatory review.
A company could acquire control without proper authorization and then obtain
a corporate family exemption for an internal reorganization – without ever
mentioning the railroad that had been acquired without proper authorization. Under

such a regulatory approach, "the Board and the public might never even know that control authority was granted." *Norfolk Southern* at 16 (J.A. ___).

### B.    Norfolk Southern's administrative law arguments are unfounded.

Norfolk Southern argues that the Board improperly added new requirements to its regulations without notice-and-comment rulemaking. *See, e.g.*, Petitioner's Brief at 24-26, 44, 52, 56-57. But the Board merely, and properly, found that Norfolk Southern had not complied with the existing rules.

As discussed above, the need for prior agency authorization for acquisitions of control is not a "new rule," but rather is a requirement of the statute. That authorization can be obtained through an application or through an exemption. But the class exemption under 49 C.F.R. § 1180.2(d)(3), on which Norfolk Southern focuses, requires minimal information precisely because it is limited to corporate reorganizations within a corporate family that do not change the competitive balance or otherwise implicate regulatory concerns. It was not "a new rule" to conclude that transactions – particularly transactions involving two carriers (here, Norfolk Southern and the Belt Line) that might anticompetitively disadvantage a third carrier (here, CSX) – could not be authorized when the controlling railroad has never even attempted to demonstrate that its acquisition of control would meet applicable regulatory standards. In saying here that the ministerial exemption procedures may not be used to smuggle substantive transactions into the approval

- 25 -

process, the Board merely explained what is obvious – that if it wants authorization to control another carrier, Norfolk Southern must present the information required by the governing statute and regulations.

Contrary to Norfolk Southern's assertion, *see* Petitioner's Brief at 49, the Board's statement – that it was "implicit" in § 1180.2(d)(3) that the exemption would only apply if there had been prior authorization to control the Belt Line – did not introduce a new regulatory requirement. It simply reflects a common-sense reading of the existing regulation: the class exemption for ministerial corporate family reorganizations only applies to carriers that are lawfully within the corporate family. *Norfolk Southern* at 16; 49 C.F.R. § 1180.2(d)(3) (exemption applies to "[t]ransactions within a corporate family"). In 1991 and 1998, the Board gave Norfolk Southern what it asked for by authorizing the consolidation of carriers lawfully within the corporate family. The Board's conclusion here that the Belt Line could not be lawfully within the corporate family in 1991 or 1998 because Norfolk Southern had never previously obtained Board authorization for the Belt Line to be in the corporate family merely explained how the regulatory framework has always worked.

For the same reason, Norfolk Southern errs in suggesting that the Board contravened the text of 49 C.F.R. § 1180.2(d)(3). Norfolk Southern's argument amounts to the claim that, because the company checked certain metaphorical

- 26 -

boxes in the § 1180.2(d)(3) regulations when filing its notices of exemption, the Board may not reject the company's claim regarding Belt Line authorization unless the Board, via a rulemaking process, adds new regulatory boxes specifically addressing prior failures to follow the clear requirements of the law. *See* Petitioner's Brief at 42-45. Norfolk Southern's argument once again fails to acknowledge the fact (not here in dispute) that the Belt Line was not authorized in 1982 to be within Norfolk Southern's corporate family. The regulation at § 1180.2(d)(3) requires only box-checking because it applies only to ministerial transactions. It does not authorize, after the fact, a new control acquisition (*i.e.*, a brand-new addition to the corporate family) that could alter the competitive landscape, as such an approach would contravene the literal terms and the purpose of the regulation.

The succinctness of the Board's rejection of Norfolk Southern's argument about the effect of the 1991 and 1998 exemptions, *see* Petitioner's Brief at 26, 42, 58-59, is hardly a fault. The Board preceded this discussion with its well-reasoned explanation of why Norfolk Southern in 1982 had failed to obtain authorization to acquire control over the Belt Line. This was the plain premise from which the Board proceeded to explain its rejection of Norfolk Southern's argument about the 1991 and 1998 exemptions. Like Norfolk Southern's application in 1982, the notices of exemption in 1990 and 1998 failed to reference the Belt Line, nor did

they make any of the substantive showings required to support authorization of control. *Norfolk Southern* at 16. Consistent with its earlier discussion of the 1982 transaction, the Board explained:

> NSR's interpretation would allow the corporate family exemption to effectively nullify other Board requirements since parties could acquire control of a carrier without informing the Board in a transaction that would normally require an application or another type of exemption under the Board's rules and then cure that unauthorized acquisition by reorganizing the corporate family and seeking a corporate family transaction exemption. Moreover, under NSR's interpretation, the Board and the public might never even know that control authority was granted since, according to NSR, the party seeking the exemption is not required to name the entities over which the exemption would provide the new control authority.

*Id.* This explanation did not "cross the line from the tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. Fed. Commc'n. Comm'n*, 444 F.2d 841, 852 (D.C. Cir. 1970).

## CONCLUSION

The Court should dismiss for lack of jurisdiction Norfolk Southern's petition for review. If the Court reaches the merits, it should deny the petition for review.

*[Signature page follows.]*

- 28 -

Respectfully submitted,

JONATHAN KANTER                    CRAIG M. KEATS
Assistant Attorney General         General Counsel

ROBERT B. NICHOLSON                ANIKA SANDERS COOPER
ROBERT J. WIGGERS                  Deputy General Counsel
Attorneys
                                   /s/ *Laura M. Wilson*
U.S. Department of Justice          LAURA M. WILSON
950 Pennsylvania Avenue, NW         Attorney
Washington, DC 20530-0001
                                   Surface Transportation Board
                                   Washington, DC  20423-0001
                                   (202) 245-0275
                                   laura.wilson@stb.gov

February 6, 2023

## ADDENDUM

## 49 U.S.C. § 10501 – General Jurisdiction

(a)(1) Subject to this chapter, the Board has jurisdiction over transportation by rail carrier that is--

(A) only by railroad; or

(B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.

(2) Jurisdiction under paragraph (1) applies only to transportation in the United States between a place in--

(A) a State and a place in the same or another State as part of the interstate rail network;

(B) a State and a place in a territory or possession of the United States;

(C) a territory or possession of the United States and a place in another such territory or possession;

(D) a territory or possession of the United States and another place in the same territory or possession;

(E) the United States and another place in the United States through

a foreign country; or

(F) the United States and a place in a foreign country.

(b) The jurisdiction of the Board over--

(1) transportation by rail carriers, and the remedies provided in this

part with respect to rates, classifications, rules (including car service,

interchange, and other operating rules), practices, routes, services, and

facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or

discontinuance of spur, industrial, team, switching, or side tracks, or

facilities, even if the tracks are located, or intended to be located,

entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided

under this part with respect to regulation of rail transportation are exclusive and

preempt the remedies provided under Federal or State law.

(c)(1) In this subsection--

(A) the term "local governmental authority"--

A-2

(i) has the same meaning given that term by section 5302 of this title; and

(ii) includes a person or entity that contracts with the local governmental authority to provide transportation services; and

(B) the term "public transportation" means transportation services described in section 5302 of this title that are provided by rail.

(2) Except as provided in paragraph (3), the Board does not have jurisdiction under this part over--

(A) public transportation provided by a local government authority; or

(B) a solid waste rail transfer facility as defined in section 10908 of this title, except as provided under sections 10908 and 10909 of this title.

(3)(A) Notwithstanding paragraph (2) of this subsection, a local governmental authority, described in paragraph (2), is subject to applicable laws of the United States related to--

(i) safety;

(ii) the representation of employees for collective bargaining; and

(iii) employment, retirement, annuity, and unemployment systems or other provisions related to dealings between employees and employers.

(B) The Board has jurisdiction under sections 11102 and 11103 of this title over transportation provided by a local governmental authority only if the Board finds that such governmental authority meets all of the standards and requirements for being a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission that were in effect immediately before January 1, 1996. The enactment of the ICC Termination Act of 1995 shall neither expand nor contract coverage of employees and employers by the Railway Labor Act, the Railroad Retirement Act of 1974, the Railroad Retirement Tax Act, and the Railroad Unemployment Insurance Act.

## 49 U.S.C. § 11323 – Consolidation, merger, and acquisition of control

(a) The following transactions involving rail carriers providing transportation subject to the jurisdiction of the Board under this part may be carried out only with the approval and authorization of the Board:

(1) Consolidation or merger of the properties or franchises of at least 2 rail carriers into one corporation for the ownership, management, and operation of the previously separately owned properties.

(2) A purchase, lease, or contract to operate property of another rail carrier by any number of rail carriers.

(3) Acquisition of control of a rail carrier by any number of rail carriers.

(4) Acquisition of control of at least 2 rail carriers by a person that is not a rail carrier.

(5) Acquisition of control of a rail carrier by a person that is not a rail carrier but that controls any number of rail carriers.

(6) Acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

(b) A person may carry out a transaction referred to in subsection (a) of this section or participate in achieving the control or management, including the power to exercise control or management, in a common interest of more than one of those rail carriers, regardless of how that result is reached, only with the approval and authorization of the Board under this subchapter. In addition to other transactions, each of the following transactions are considered achievements of control or management:

(1) A transaction by a rail carrier that has the effect of putting that rail carrier and person affiliated with it, taken together, in control of another rail carrier.

(2) A transaction by a person affiliated with a rail carrier that has the effect of putting that rail carrier and persons affiliated with it, taken together, in control of another rail carrier.

(3) A transaction by at least 2 persons acting together (one of whom is a rail carrier or is affiliated with a rail carrier) that has the effect of putting those persons and rail carriers and persons affiliated with any of them, or with any of those affiliated rail carriers, taken together, in control of another rail carrier.

(c) A person is affiliated with a rail carrier under this subchapter if, because of the relationship between that person and a rail carrier, it is reasonable to believe that the affairs of another rail carrier, control of which may be acquired by that person, will be managed in the interest of the other rail carrier.

**49 U.S.C. § 11324 – Consolidation, merger, and acquisition of control: conditions of approval**

(a) The Board may begin a proceeding to approve and authorize a transaction referred to in section 11323 of this title on application of the person seeking that

authority. When an application is filed with the Board, the Board shall notify the chief executive officer of each State in which property of the rail carriers involved in the proposed transaction is located and shall notify those rail carriers. The Board shall hold a public hearing unless the Board determines that a public hearing is not necessary in the public interest.

(b) In a proceeding under this section which involves the merger or control of at least two Class I railroads, as defined by the Board, the Board shall consider at least--

(1) the effect of the proposed transaction on the adequacy of transportation to the public;

(2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction;

(3) the total fixed charges that result from the proposed transaction;

(4) the interest of rail carrier employees affected by the proposed transaction; and

(5) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region or in the national rail system.

A-7

(c) The Board shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Board may impose conditions governing the transaction, including the divestiture of parallel tracks or requiring the granting of trackage rights and access to other facilities. Any trackage rights and related conditions imposed to alleviate anticompetitive effects of the transaction shall provide for operating terms and compensation levels to ensure that such effects are alleviated. When the transaction contemplates a guaranty or assumption of payment of dividends or of fixed charges or will result in an increase of total fixed charges, the Board may approve and authorize the transaction only if it finds that the guaranty, assumption, or increase is consistent with the public interest. The Board may require inclusion of other rail carriers located in the area involved in the transaction if they apply for inclusion and the Board finds their inclusion to be consistent with the public interest.

(d) In a proceeding under this section which does not involve the merger or control of at least two Class I railroads, as defined by the Board, the Board shall approve such an application unless it finds that--

   (1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

(2) the anticompetitive effects of the transaction outweigh the public

interest in meeting significant transportation needs.

In making such findings, the Board shall, with respect to any application that is

part of a plan or proposal developed under section 333(a)-(d) of this title, accord

substantial weight to any recommendations of the Attorney General.

(e) No transaction described in section 11326(b) may have the effect of avoiding

a collective bargaining agreement or shifting work from a rail carrier with a

collective bargaining agreement to a rail carrier without a collective bargaining

agreement.

(f)(1) To the extent provided in this subsection, a proceeding under this subchapter

relating to a transaction involving at least one Class I rail carrier shall not be

considered an adjudication required by statute to be determined on the record after

opportunity for an agency hearing, for the purposes of subchapter II of chapter 5 of

title 5, United States Code.

(2) Ex parte communications, as defined in section 551(14) of title 5, United States

Code, shall be permitted in proceedings described in paragraph (1) of this

subsection, subject to the requirements of paragraph (3) of this subsection.

(3)(A) Any member or employee of the Board who makes or receives a written ex parte communication concerning the merits of a proceeding described in paragraph (1) shall promptly place the communication in the public docket of the proceeding.

(B) Any member or employee of the Board who makes or receives an oral ex parte communication concerning the merits of a proceeding described in paragraph (1) shall promptly place a written summary of the oral communication in the public docket of the proceeding.

(4) Nothing in this subsection shall be construed to require the Board or any of its members or employees to engage in any ex parte communication with any person. Nothing in this subsection or any other law shall be construed to limit the authority of the members or employees of the Board, in their discretion, to note in the docket or otherwise publicly the occurrence and substance of an ex parte communication.

## 49 U.S.C. § 10102(3) – Definitions

"control", when referring to a relationship between persons, includes actual control, legal control, and the power to exercise control, through or by

(A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means

## 49 C.F.R. Part 1201, Subpart A (ii)(5)(b) – Definitions

*Control* (including the terms *controlling, controlled by,* and *under common control with*) means the possession directly or indirectly, of the power to direct or cause the direction of the management and policies of a company, whether such power is exercised through one or more intermediary companies, or alone, or in conjunction with, or pursuant to an agreement, and whether such power is established through a majority of minority ownership or voting of securities, common directors, officers or stockholders, voting trusts, holding trusts, associated companies, contract or any other direct or indirect means

## 49 C.F.R. § 1180.6(a)(1) – Supporting Information

All applications filed under 49 U.S.C. 11323 shall show in the title the names of the applicants and the nature of the proposed transaction. Beneath the title indicate the name, title, business address, and telephone number of the person(s) to whom correspondence with respect to the application should be addressed. The following information shall be included in all applications:

(1) A description of the proposed transaction, including appropriate references to any supporting exhibits and statements contained in the application and discussing the following:

(i) A brief summary of the proposed transaction, the name of applicants, their business address, telephone number, and the name of the counsel to whom questions regarding the transaction can be addressed.

(ii) The proposed time schedule for consummation of the proposed transaction.

(iii) The purpose sought to be accomplished by the proposed transaction, e.g., operating economies, eliminating excess facilities, improving service, or improving the financial viability of the applicants.

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2023, I electronically filed the foregoing

BRIEF OF RESPONDENTS with the Clerk of the Court for the United States

Court of Appeals for the District of Columbia Circuit by using the appellate

CM/ECF system and that the participants in the case who are registered CM/ECF

users will be served by the appellate CM/ECF system.

<u>/s/ Laura M. Wilson</u>
LAURA M. WILSON
Attorney
Surface Transportation Board
395 E Street, SW
Washington, DC 20423-0001
laura.wilson@stb.gov

February 6, 2023

## CERTIFICATE OF COMPLIANCE
## WITH LENGTH LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6409 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman font, size 14.

/s/ *Laura M. Wilson*
LAURA M. WILSON
Attorney
Surface Transportation Board
395 E Street, SW
Washington, DC 20423-0001
laura.wilson@stb.gov

February 6, 2023