No. 22-1209

In the
# United States Court of Appeals
# For the District of Columbia Circuit

———————————

NORFOLK SOUTHERN RAILWAY CO.,

*Petitioner,*

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,

*Respondents,*

CSX TRANSPORTATION, INC.,

*Intervenor.*

———————————

On Petition for Review of a Decision of the Surface Transportation Board

———————————

**BRIEF OF INTERVENOR
CSX TRANSPORTATION, INC. IN SUPPORT OF RESPONDENTS**

———————————

**ORAL ARGUMENT NOT YET
SCHEDULED**

February 13, 2023

Benjamin L. Hatch
Robert W. McFarland
Jeanne E. Noonan
MCGUIREWOODS LLP
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
 (757) 640-3727
*bhatch@mcguirewoods.com*
*rmcfarland@mcguirewoods.com*
*jnoonan@mcguirewoods.com*
*Counsel for CSX Transportation, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

All parties and intervenors appearing in this Court are listed in the Briefs of Petitioner and Respondents.  No amici have appeared.  CSX has intervened in this case in support of the Respondents, the Surface Transportation Board and the United States of America.

### B.    Rulings Under Review

References to the rulings at issue appear in the Brief of Respondents, and the ruling under review is attached to Petitioner's Petition for Review.

### C.    Related Cases

The related cases are listed in the Brief of Respondents.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, CSX hereby discloses that:

1.     CSX Transportation, Inc. is a corporation organized under the laws of Virginia, with its principal place of business in Jacksonville, Florida. CSX Transportation, Inc. is a Class I railroad operating in the Eastern United States and Canada.

2.     CSX Transportation, Inc. is wholly owned by the publicly held corporation CSX Corporation.  No publicly held corporation holds a 10% or greater share of the stock of CSX Corporation.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................... 1

STATUTES AND REGULATIONS ................................................ 5

STATEMENT OF ISSUES ......................................................... 5

STATEMENT OF THE CASE ..................................................... 6

SUMMARY OF THE ARGUMENT ............................................... 6

ARGUMENT ........................................................................... 8

I.      Jurisdiction to review the STB Decision lies with the District Court. ..........................................................................8

    A.      The Record Below—Including NS's Own Representations—Demonstrates that the STB Decision Arose out of a Referred Question from EDVA. ...........................9

    B.      This Court's Decision in *McCarty Farms* Supports Dismissal. ......................................................................15

II.     If This Court Reaches the Merits, It Should Affirm the STB's Rulings Which Comport with the Administrative Procedure Act. ..................................................................................21

    A.      Standard of Decision Review Under the APA. ............................22

    B.      The STB Decision is Consistent With the ICA and Applicable Regulations. ...................................................24

        1.      The Agency Must Consider Statutory Criteria Before Granting Control Authority. .....................................25

        2.      The Board and the Public Must Have Adequate Notice Before Control Authority is Granted. .....................29

    C.      The STB's Reasoned Explanation, Interpreting the Regulations, is Neither Arbitrary Nor Capricious. ....................32

        1.      The STB Provided a Reasoned Explanation. ......................33

2.    The STB Decision Consistently Applied the
Regulations and Did Not Announce a New Rule............36

CONCLUSION ..........................................................................................40

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.*,
194 F.3d 125 (D.C. Cir. 1999)...........................................................37

*Cent. & S. Motor Freight Tariff Ass'n v. United States*,
757 F.2d 301 (D.C. Cir. 1985).............................................................23

*Doe v. Sec. & Exch. Comm'n*,
28 F.4th 1306 (D.C. Cir. 2022) ...........................................................22

*In Def. of Animals v. USDA*,
589 F. Supp. 2d 41 (D.D.C. 2008).........................................................12

*Jost v. Surface Transp. Bd.*,
194 F.3d 79 (D.C. Cir. 1999)................................................................33

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*,
896 F.3d 501 (D.C. Cir. 2018)...............................................................8

*Kessler v. Surface Transp. Bd.*,
635 F.3d 1 (D.C. Cir. 2011)..................................................................22

*Kisor v. Wilkie*,
─── U.S. ───, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019) ............................22, 23

*Konstantinidis v. Chen*,
626 F.2d 933 (D.C. Cir. 1980)..............................................................12

*Martin v. OSHRC*,
499 U.S. 144 (1991).........................................................................37

---

[1] There are no authorities "chiefly" relied on under Circuit Rule 28.

*Ex parte McCardle*,
  74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868) .......................................9

*McCarty Farms, Inc. v. Surface Transp. Bd.*,
  158 F.3d 1294 (D.C. Cir. 1998)..................................... 8, 10, 15, 16, 17, 18, 19

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)...................................................................12

*POET Biorefining, LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020)...................................................23

*Safari Club Int'l v. Zinke*,
  878 F.3d 316 (D.C. Cir. 2017)...................................................23

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)..................................................................9

**Statutes**

5 U.S.C. § 706...........................................................................22

28 U.S.C. § 1336.............................................................1, 5, 6, 9, 12

49 U.S.C. § 10502.......................................................................27

49 U.S.C. § 11321(a)..........................................................3, 13, 20, 26

49 U.S.C. § 11323.............................................................3, 24, 26

49 U.S.C. § 11324.......................................................................26

**Regulations**

49 C.F.R. § 1117.1......................................................................14

49 C.F.R. § 1180.2........................................................26, 27, 36, 38, 39

49 C.F.R. § 1180.4......................................................................27

49 C.F.R. § 1180.6 ............................................................................................27

## Glossary

| | |
|---|---|
| APA | Administrative Procedure Act |
| Aug. 9, 2021 Decision | *Norfolk Southern Railway Company—Petition for Declaratory Order*, ID-50873, STB No. FD 36522 (STB served Aug. 9, 2021) (JA__-__) |
| CSX/CSXT | CSX Transportation, Inc. |
| CSX STB Opening | CSX's Opening Statement, STB No. FD 36522 (Sept. 23, 2021) (JA__-__) |
| Decision or STB Decision | *Norfolk Southern Railway Company—Petition for Declaratory Order*, STB No. FD 36522 (June 17, 2022) (JA__-__) |
| EDVA | United States District Court for the Eastern District of Virginia |
| ICA | Interstate Commerce Act |
| ICC | Interstate Commerce Commission |
| NS/NSR | Norfolk Southern Railway Company |
| NS STB Opening | Norfolk Southern Railway Company's Opening Statement, STB No. FD36522 (Sept. 23, 2021) (JA__-__) |
| NSC | Norfolk Southern Corporation, predecessor of NS |
| NW | Norfolk & Western Railway Company |
| NPBL/Belt Line | Norfolk & Portsmouth Belt Line Railroad Company |

| | |
|---|---|
| NS Opening Br. | Opening Brief of Petitioner Norfolk Southern Railway Co. |
| Resp. Br. | Brief of Respondents Surface Transportation Board and United States of America |
| SRC | Southern Railway Company |
| The Board/STB | United States Surface Transportation Board |

INTRODUCTION

Petitioner Norfolk Southern Railway Company (NS) asks this Court to review two paragraphs in a unitary Surface Transportation Board (STB or the Board) decision issued in response to a question referred at NS's request by the District Court for the Eastern District of Virginia (EDVA). *See Norfolk Southern Railway Company—Petition for Declaratory Order*, STB No. FD 36522 (June 17, 2022) (hereinafter, the "Decision" or the "STB Decision") (JA__). Under 28 U.S.C. § 1336, exclusive jurisdiction to review a challenge to the STB Decision lies with the EDVA, as the entire STB Decision, including that portion challenged by NS's petition, arose out of the EDVA's referral order.

NS instituted the STB proceedings on the express basis of resolving the referred question from the EDVA.  In the EDVA, NS had argued that it received authority to control Norfolk & Portsmouth Belt Line Railroad Company ("NPBL") through a 1982 merger, and that such control authority vested it with immunity from federal and state law.  Before the STB, NS introduced, in passing, the argument that the 1991 and 1998 transactions supported its position on this referred question.  The STB addressed—and

1

correctly dispensed with—all arguments that NS introduced on the referred question. As the STB Decision arises from and specifically relates to the referred question, that decision must be addressed by the EDVA, and NS's petition should therefore be dismissed for lack of jurisdiction.

If this Court reaches the merits, the STB Decision was correct, and certainly not arbitrary and capricious. NS does not challenge the majority of the STB Decision, which concluded that NS did not obtain authority to control NPBL in a 1982 merger proceeding. That was the core of NS's argument to the STB. Now NS pivots to argue that even though it did not gain control in 1982, it somehow *sub silentio* gained new control authority over NPBL through the corporate family exemption proceedings in 1991 and 1998. The fact is that NS and its predecessors never requested, never justified, and never obtained authority to control NPBL. The Interstate Commerce Act (ICA) requires that a railroad seeking to control another railroad must ask the Board (previously the Interstate Commerce Commission (ICC)) for control authority and show that competition will not be harmed. It cannot assert control over another railroad until such

authority is granted.  *See* 49 U.S.C. § 11323.  The predicate for antitrust immunity is the request for and grant of control authority.  *See id.* § 11321(a).  But NS never obtained antitrust immunity because the Board never granted it control authority.

As is now established by the unchallenged portion of the STB's Decision below, NPBL did not come within NS's predecessor corporate family in 1982 and control authorization over NPBL was not granted in 1982.  As a result, new control authority over NPBL could not have been granted in the 1991 and 1998 corporate reorganization transactions.  These reorganizations simplified existing control arrangements.  They were not and could not be used to grant *new* control authority and *new* antitrust immunity over NPBL.

The STB Decision concerning these transactions is consistent with its ruling regarding the 1982 merger, and with the ICA and the applicable regulations.  Contrary to NS's argument, the STB did not purport to announce a new rule without engaging the rulemaking process, nor did it do so in effect.  The STB simply interpreted its own statutes and regulations

3

to conclude on the record presented that NS had not achieved control of NPBL through exemption proceedings (a) that are not available for granting new control authority that changes existing competitive relationships and (b) in which NS never indicated or provided notice that it sought to control NPBL.  NS's argument is that a common carrier can gain statutorily-required STB authority and related antitrust immunity—indeed, immunity from all laws—silently, without notice, and without any review by the STB.  The STB correctly rejected that sweeping claim.  This conclusion squares with the need to give the public—including competitors like CSX—notice of any proceeding that might result in new control authority.  Such notice enables the public—and competitors—to challenge the sought-after control authority before the agency to the extent it would be harmful to competition.

Finally, the STB adequately explained its ruling that NS could not use exemptions to obtain control authority and antitrust immunity by stealth. The STB's discussion of the 1991 and 1998 transactions was commensurate with addressing the argument that NS advanced.  In NS's submissions to the STB, its primary argument related to the 1982 proceedings—which it no

longer challenges; the 1991 and 1998 transactions were only raised by NS in

passing, and in support of its argument related to the 1982 proceeding. Thus,

if the Court decides it has jurisdiction, it should deny NS's petition.

### STATUTES AND REGULATIONS

Pursuant to Federal Rule of Appellate Procedure 28(i), CSX adopts the

Statutes and Regulations in the Brief of Respondents. Resp. Br. 3 &

Addendum.

### STATEMENT OF ISSUES

1.    Whether 28 U.S.C. § 1336(b) provides that exclusive jurisdiction

over this matter resides with the district court that referred the question to

the STB.

2.    Whether the STB Decision was arbitrary and capricious in

holding that the 1991 and 1998 corporate family exemption transactions

could not authorize NS to control NPBL and confer antitrust immunity on

NS in light of the ICA and its regulations that require notice, prior review,

and Board approval before one rail carrier is authorized to control another.

3.    Whether the STB Decision was arbitrary and capricious for lack

of adequate explanation, when the agency, applying its substantive expertise, reasonably explained that a corporate family exemption—used in this case for two corporate reorganizations that never mentioned NPBL—cannot grant new control authority over NPBL.

## STATEMENT OF THE CASE

Pursuant to Federal Rule of Appellate Procedure 28(i), CSX adopts by reference the Statement of the Case set forth in the Respondents' Brief.

## SUMMARY OF THE ARGUMENT

I.    Under 28 U.S.C. § 1336(b), jurisdiction over the STB Decision lies with the EDVA.  NS challenges two paragraphs of a unitary decision, relating to supplementary arguments NS advanced in support of its central premise: that the 1982 merger granted its predecessor the authority to control NPBL.  The portions of the STB Decision NS now challenges are inextricably intertwined with the referred question, and by definition arise out of the district court's referral.  This Court's decision in *McCarty Farms* bolsters that conclusion and supports dismissal.  This Court should find it lacks jurisdiction and dismiss the petition.

II.     Moreover, any limited review of the STB Decision under the Administrative Procedure Act's (APA) arbitrary and capricious standard confirms the portions NS challenges rest on reasoned decision making, consistent with the ICA and applicable regulations.  The STB did not purport to announce a new rule, but rather interpreted its own regulations and applied them to the facts in resolving NS's petition for a declaratory order.  NS makes no argument that the STB cannot engage in adjudication, which is precisely what it performed.  Moreover, the agency is entitled to deference in interpreting its own regulations.  Thus, the STB reasonably concluded that because NS was never authorized to control NPBL pursuant to the ICA, and because the regulations for corporate family exemptions cannot grant new control authority for a transaction resulting in changes in competitive relationships, NS could not have achieved control authority through the 1991 and 1998 transactions.

The agency provided a reasoned explanation for the STB Decision.  The STB explained that NS cannot seek new control authority and immunity from antitrust laws by stealth through exemption proceedings that are

7

intended only to authorize ministerial changes in a corporate structure. Moreover, in contrast to what it now contends, NS's arguments about the 1991 and 1998 transactions played only a minor role in its briefing before the STB. Accordingly, the STB Decision was appropriately commensurate with the limited attention NS afforded these points below.

Should this Court find it has jurisdiction, it should defer to the agency's interpretation of its own regulations and affirm the STB Decision.

## ARGUMENT

## I.     Jurisdiction to review the STB Decision lies with the District Court.

This Court should dismiss NS's petition for lack of jurisdiction. NS's efforts to create jurisdiction by parsing short references in a unitary Decision that discusses the 1991 and 1998 transactions, made within the context of answering a referred question, should be rejected.

Before reaching the merits of NS's petition, this Court "must assure itself of the existence of subject-matter jurisdiction." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018); *McCarty Farms, Inc. v. Surface Transp. Bd.*, 158 F.3d 1294, 1298 (D.C. Cir. 1998) ("[W]e must

resolve all jurisdictional questions before proceeding to the merits"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.") (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)).  NS fails to meet its burden of establishing this Court's jurisdiction.  *See Steel Co.*, 523 U.S. at 103–04.

### A. The Record Below—Including NS's Own Representations—Demonstrates that the STB Decision Arose out of a Referred Question from EDVA.

Under 28 U.S.C. § 1336(b), the "exclusive jurisdiction" to review the STB Decision on a question or issue referred to the agency by a district court lies with the referring district court.  28 U.S.C. § 1336(b).  Congress' language in Section 1336(b) is clear: when a district court refers a "question or issue" to the STB, it also is vested with the authority to "enforce, enjoin, set aside, annul, or suspend, *in whole or in part*, any order of the Surface Transportation Board *arising out of such referral*."  *Id.* (emphasis added).  Here, NS seeks to challenge *a part of* the STB's decision "arising out of such referral."  Section 1336(b) directs that jurisdiction for such challenge lies in the EDVA.

The entire STB decision, including the part NS carves out, arose from the referred question.  *See McCarty Farms*, 158 F.3d at 1299 (interpreting the term "arise" in Section 1336 as "to originate").  The first sentence in NS's originating petition states that NS filed the petition "to address the issues referred to the Board by the District Court in its May 18, 2021 decision."  NS Petition for Declaratory Order, STB No. FD 36522 at 2 (entered June 21, 2021) (JA__).

On August 9, 2021, the STB issued a decision instituting the requested declaratory order proceeding and setting the schedule for the same.  In that decision, the STB noted that NS had filed its petition "to address the issues referred to the Board by the [EDVA]."  *Norfolk Southern Railway Company—Petition for Declaratory Order*, ID-50873 at 1, STB No. FD 36522 (STB served Aug. 9, 2021) (Aug. 9, 2021 Decision) (JA__).  The STB concluded that: "The *questions above have been referred by a court of competent jurisdiction* and otherwise appear to be within the Board's jurisdiction.  A proceeding therefore will be instituted *to address the issues referred by the district court*."  *Id.* at 2 (emphasis added) (JA__).

In the first sentence of its opening statement, NS reiterated that it petitioned the STB "to address an issue that was raised in the context of litigation brought by CSX Transportation ("CSXT") in the U.S. District Court for the Eastern District of Virginia ("District Court") and referred to the Board."   NS STB Opening Statement, ID-303032 at 2, STB No. FD 36522 (entered Sept. 23, 2021) (JA__).

NS suggests that it "first addressed" the 1982 merger before the STB, and "then raised two issues"—namely the 1991 and 1998 transactions.  *See* NS Opening Br. at 19, NS Opp'n to Motions to Dismiss at 10.  To the extent NS's reference implies the later transactions were set forth as separate issues before the STB, that claim is misleading, at best.  NS actually presented its argument on the 1991 and 1998 transactions in a sub-section of its brief entitled "*The 1982 Transaction* Granted NSC The Right To Exercise Control Of NPBL."  NS STB Opening at 11 (JA__) (emphasis added).  The 1991 and 1998 transactions were included at the end of that sub-section, as supporting points about the import of the 1982 merger.[2]

---

[2] NS should not be allowed to play fast and loose with the district court, the

The declaratory proceeding itself was initiated as a result of the referred question, and the issues concerning the 1991 and 1998 transactions are not distinct or "new" issues.  The EDVA referral order framed the referred question around the 1982 merger.  The portion of the STB Decision that addressed the 1991 and 1998 transactions specifically "aros[e] out of such referral."  28 U.S.C. § 1336(b).  Indeed, NS's opening brief before the STB was almost exclusively devoted to the 1982 merger, and only briefly posited that "NSC's indirect control [of NPBL] was *further* solidified and authorized *again* through two subsequent transactions, one in 1991 and the other in 1998."  NS STB Opening at 3 (JA__) (emphasis added).  NS thus argued that the 1991 and 1998 transactions further demonstrated it obtained "control" *from the STB in 1982*.  That point was advanced in support of its principal position regarding the 1982 merger.  This argument was not broken

_____

STB, and this Court.  *See New Hampshire v. Maine*, 532 U.S. 742, 743 (2001) (judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."); *In Def. of Animals v. USDA*, 589 F. Supp. 2d 41, 42 (D.D.C. 2008) (*citing Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980)).

12

into separate counts for declaratory relief, nor even contained in separate
sections in the opening statement.  Critically, the 1991 and 1998 transactions
were never identified by NS as new or distinct issues separate from the
referred question.

As CSX identified above and in its Motion, NS repeatedly told the STB
that its declaratory petition sought a resolution of the district court's referred
question, that the referred question involved NS's authority to control NPBL
and its immunity from suit, and that the referred question included the 1991
and 1998 transactions.  CSX Mot. to Dismiss at 5–6, 10–11; NS Petition for
Declaratory Order at 2 n.1 (JA__) (describing the district court's order as
"referring to the STB *the issue* of whether NSR was authorized to control
[NPBL] and the applicability of antitrust immunity." (emphasis added)); NS
STB Opening at 2 n.1 (JA__) ("the District Court issued an Opinion and
Order . . . referring to the STB a question regarding the applicability of §
11321(a) immunity ("May 18th Decision") *to several transactions* previously
approved or authorized by the Interstate Commerce Commission ("ICC")

*and the STB.*" (emphasis added)[3]).  In its reply brief before the STB, NS's final point was: "*The Only Question Before the Board is Whether NSC has the Authority to Control NPBL.*"  NS 's Reply to CSX's STB Opening Statement, ID-303126 at 40, STB No. FD 36522 (Oct. 25, 2021) (JA__) (emphasis added).  NS's Opposition and Opening Brief are completely silent as to its positions below, even after CSX's Motion to Dismiss identified this divergence in positions.

NS takes the position that "STB proceedings are not limited to the contours of district-court referrals."  NS Opening Br. at 39 (citing 49 C.F.R. § 1117.1).  Yet absent from NS's Petition for a Declaratory Order is *any* reference to the 1991 and 1998 transactions as separate grounds for relief, independent of the referred question.  NS effectively concedes in its Opening Brief that it did not institute separate proceedings or seek relief independent

---

[3] There is no doubt that NS's "several transactions" statement refers to the 1982, 1991 and 1998 transactions.  In addition to being the only "several transactions" at issue below, the NS statement references that the transactions were exempted by the ICC *and the STB*.  The STB exempted the 1998 transaction after its creation, whereas the ICC approved the 1982 transaction and exempted the 1991 transaction.  *See also* Decision at 8 (JA__).

of the referred question related to the 1991 and 1998 transactions. NS Opening Br. at 19. NS's current argument that the 1991 and 1998 transactions are "new" issues does not square with its positions before the STB or the agency record, and NS makes no attempt to explain the discrepancies. Based on the language of Section 1336(b) and NS's previous representations, the 1991 and 1998 transactions arise out of the EDVA's referral.

## B.    This Court's Decision in *McCarty Farms* Supports Dismissal.

NS's reliance on *McCarty Farms, Inc. v. Surface Transportation Board*, 158 F.3d 1294 (D.C. Cir. 1998) fails. *McCarty Farms* involved the review of a very different agency proceeding, and its holding supports dismissal here. *McCarty Farms* considered a consolidated agency proceeding before the STB in which there were "three sets of claims," each with its own docket number designation and some of which had different parties in interest. *Id.* at 1296. In analyzing Section 1336(b), this Court determined that the referring district court had jurisdiction over related claims, whereas it had jurisdiction over distinct ones.

The first claim—involving "single-car wheat shipments moving before

September 12, 1980"—was included in McCarty Farms' federal court complaint prior to referral to the ICC.  This Court readily concluded that it did not have jurisdiction over that claim in light of Section 1336(b).  *Id.* at 1298.

The second claim—involving "multiple-car and trainload shipments of wheat and barley"—arose out of a separate Montana Department of Agriculture complaint consolidated in the STB proceedings but distinct from both the federal district court litigation and referral order.  The parties thus agreed that this Court, not the district court, had jurisdiction over an appeal of the agency's ruling on that claim.  That second claim involved distinct factual questions that were never part of the district court litigation or referral.

The third claim—involving "single-car shipments of barley and single-car shipments of wheat moving after September 12, 1980"—presented a "more difficult" question. *McCarty Farms*, 158 F.3d at 1298.  Ultimately, this Court determined that "[i]n no sense did the third category of claims originate in the district court's referral." *Id.* at 1299.  The third category

16

originated in a separate complaint that McCarty Farms filed with the ICC, not the district court. Significantly, McCarty Farms "could not have filed the third category of claims in the district court, even if it had wanted to do so." *Id.* As those claims related to "a prescription on future rates, a remedy not available in the district court," this Court understandably concluded that "Congress did not intend to authorize litigants to expand the district court's jurisdiction beyond its legitimate scope by filing complaints with the ICC and then seeking review of those complaints by the district court pursuant to Section 1336(b)." *Id.*

NS cannot explain how its STB petition "originated" from any source other than the district court referral. *McCarty Farms*, 158 F.3d at 1299 (defining the term "arise" as "to originate"). As noted above, the STB Decision arose out of and originated with the district court proceedings, and thus jurisdiction lies exclusively with the district court. *See supra* pp. 9–15; *see also* CSX Mot. to Dismiss at 9–10.

Rather, NS hinges its entire argument on its interpretation of a single paragraph in *McCarty Farms* wherein this Court adopted "a strict

17

construction of Section 1336(b)," and created a "bright line rule" by stating "issues expressly set out in the district court's referral order are reviewed by the district court." NS Opening Br. at 37–38, NS Opp'n to Motions to Dismiss at 21 (citing *McCarty Farms*, 158 F.3d at 1300). As the STB explains, this Court's use of the term "issues" is best understood in the context of broad claims for relief. *See* Resp. Br. at 19–20.

That one paragraph from *McCarty Farms* cannot bear the weight NS places on it. Although *McCarty Farms* describes the benefits of a bright line rule, its actual holding does not rely on a bright line rule for determining jurisdiction over the claims at issue. *See McCarty Farms*, 158 F.3d at 1299–1300. Prior to its "bright line" wording, the Court analyzed and ruled on the three sets of claims at issue. This Court "h[e]ld" it possessed jurisdiction over claims that (a) could not have been filed in the district court and (b) which the district court had been divested of jurisdiction by the Staggers Rail Act. *Id.* at 1299. This Court concluded: "These claims, not being within the jurisdiction of the district court, could not have 'arisen' out of any referral from that court." *Id.* at 1300. This analysis did not cite or rely on a "bright

line" rule.

The "bright line" rule discussion comes later in the decision, as the Court notes that its ruling is "consistent with congressional intent" and prior decisions. *Id.* at 1300. But that discussion was not necessary for the Court's disposition; the Court had already issued its holding, and in the concluding section of its analysis, it returned to its reliance on the district court's lacking jurisdiction. *Id.* ("In sum, we are convinced that the disputed claims, not having been within the jurisdiction of the district court, cannot have arisen out of a referral from that court."). In sharp contrast, NS's immunity defense not only could have been presented to the district court, it was in fact presented, albeit belatedly.

NS also cites *McCarty Farms* for the proposition that claims do not arise out of a referral under Section 1336(b) if the referral "makes no mention of them." NS Opening Br. at 29, NS Opp'n to Motions to Dismiss at 15–17. That language in *McCarty Farms* did not announce a formal rule, but rather addressed an argument that claims could "arise" out of a referral that did not reference them. Here, it is not only CSX's and the STB's position that the

claims arose out of the referral order; *that was the express position NS articulated below. See supra* pp. 9–15.  That position is further confirmed by the referral order asking the STB for a ruling on NS's immunity claim, which the 1991 and 1998 transactions relate to by NS's own framing.  The district court explained that its order referred "a single question to the STB regarding the applicability of § 11321(a) immunity" because of the STB's primary jurisdiction and "special competence."  *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No. 2:18-cv-00530, ECF No. 395, Opinion and Order at 5, 26 (E.D. Va. May 18, 2021) (JA__, __).  It is implausible to suggest that the referring district court was not seeking to have the STB resolve NS's immunity arguments in toto, when that was the basis on which NS asked for and received the referral.

In its efforts to support jurisdiction, NS also contends that proceeding before this Court is more efficient than having the district court review the few paragraphs in the STB decision that address the 1991 and 1998 transactions.  NS claims that as the district court has not received any briefing on these issues, it is "no better positioned than this Court to address

them." NS Opening Br. at 41, NS Opp'n to Motions to Dismiss at 25. These contentions wholly ignore the procedural record. There is nothing efficient in NS instituting this collateral appeal, as opposed to returning to the referring district court, as Section 1336(b) directs. In fact, NS has filed a "protective complaint" before the district court raising the same issue herein. On October 26, 2022, that matter was assigned to Chief Judge Davis, who presides over the original action. There is nothing efficient in NS's efforts to multiply litigation, and NS makes no claim that the district court and the Fourth Circuit are not fully capable of addressing its claims.

## II.    If This Court Reaches the Merits, It Should Affirm the STB's Rulings Which Comport with the Administrative Procedure Act.

Should this Court address the challenged portions of the STB Decision, it should hold the STB's findings regarding the 1991 and 1998 transactions are reasonable and reasonably explained. First, the STB Decision is consistent with the applicable statute and regulations. It neither purports to amend the existing regulations or create a new rule, nor does it do so in effect. Second, the STB Decision is reasonable and commensurate with the limited argument NS advanced regarding the 1991 and 1998 transactions. In

addition, the STB's analysis of the 1982 merger, which NS does not challenge,

provides relevant context and an explanation of its holdings on the 1991 and

1998 transactions.

The STB provided a reasoned explanation for its rulings and NS's

contentions otherwise are unpersuasive, especially in light of the deference

owed to the agency, and NS's inconsistent and illogical positions regarding

control authority.  CSX adopts by reference the Respondents' argument on

this issue, and submits the following additional support.

## A.    Standard of Decision Review Under the APA

This Court reviews the STB Decision with deference, and must uphold

it unless it is found to be "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706; *Kessler v. Surface*

*Transp. Bd.*, 635 F.3d 1, 5 (D.C. Cir. 2011).  "Courts defer to an agency's

interpretation of its own regulation if the regulation in question is 'genuinely

ambiguous' and if the agency's reading is reasonable."  *Doe v. Sec. & Exch.*

*Comm'n*, 28 F.4th 1306, 1311 (D.C. Cir. 2022) (quoting *Kisor v. Wilkie*, ––– U.S.

–––, 139 S. Ct. 2400, 2415–16, 204 L.Ed.2d 841 (2019)).  To afford deference,

the agency's interpretation "must reflect its authoritative, expertise-based, and fair and considered judgment; and the agency must take account of reliance interests and avoid unfair surprise." *Kisor*, 139 S. Ct. at 2424 (Roberts, J. concurring).

This Court's scope of review under the APA is narrow. *Cent. & S. Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 321 (D.C. Cir. 1985) ("a court is not to substitute its judgment for that of the agency."). An agency's decisions that, as here, interpret and apply its own governing statutes and regulations are entitled to "substantial deference." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 326 (D.C. Cir. 2017). Indeed, this Court has previously stated, "[b]ecause we lack the knowledge and experience needed to evaluate the transportation requirements of the nation, we accord the Commission a great deal of discretion and appropriately defer to its expertise." *Cent. & S. Motor Freight*, 757 F.2d at 322 (citations omitted). And as this Court has also explained, the deferential arbitrary and capricious standard "requires that agency action simply be 'reasonble and reasonably explained.'" *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 409 (D.C. Cir. 2020)

(citations omitted).

**B.    The STB Decision is Consistent With the ICA and Applicable Regulations.**

The STB Decision fully accords with a plain reading of the statute and regulations at issue.  NS cannot show that the STB Decision is an arbitrary or capricious application of the framework created by the statute and regulations.  As established by the Board in the unchallenged portion of the STB Decision: immunity from antitrust laws cannot be obtained when an applicant does not identify the rail carrier it is seeking to control and affirmatively disclaims any intent to control that rail carrier.  Likewise, and consistent with Congressional intent, control authority to create new competitive relationships and immunity from the antitrust laws for those relationships cannot be obtained through a corporate family exemption with no requirement to disclose or even mention the entity to be controlled and no analysis of competitive impact.  To find otherwise would contravene the plain language of the control statute, 49 U.S.C. § 11323, and the applicable regulations.  It would deprive the public and interested third-parties of adequate notice, as well as the STB's statutorily required review of the

24

request for control authority.

### 1.    The Agency Must Consider Statutory Criteria Before Granting Control Authority.

In an abrupt change of position, NS now argues that although the 1982 transaction did *not* authorize NS's control over NPBL, NS can circumvent the statutory requirements and obtain control over NPBL through a later exempt corporate family transaction, without ever disclosing it would control NPBL.[4]  The STB properly rejected NS's argument, as "the Board and the public might never even know that control authority was granted." Decision at 16 (JA__).

The ICA is clear: certain transactions involving control of rail carriers may only be carried out with the approval and authorization of the Board.

---

[4] NS's position on antitrust immunity is a moving target.  Initially, NS did not move to dismiss any of CSX's antitrust claims in the EDVA litigation.  It was not until over a year after filing, on January 31, 2020, that NS filed a motion to dismiss, for judgment on the pleadings, and for referral of issues to the Board.  There, NS argued, for the first time, that it was immune from CSX's antitrust claims because the ICC granted NS authority to "control" NPBL as a result of the 1982 merger between Norfolk and Western Railway Company (NW) and Southern Railway Company (SRC).  As an alternative remedy, NS asked the district court to refer the "control" question to the STB.

49 U.S.C. § 11323.  The ICA requires the STB to approve and authorize a control transaction "when it finds the transaction is consistent with the public interest."  *Id.* § 11324(c).  It also requires that the Board consider the anticompetitive effects of the a control transaction.  *See id.* § 11324 (b), (d).  When the Board determines that the competitive effects of a transaction are consistent with the public interest, the ICA provides an exemption from the antitrust laws, and all other laws to the extent necessary, to exercise the control acquired through the transaction.  *See id.* § 11321(a).

Control authority, and its corresponding antitrust immunity, cannot be inferred.  These principles are reinforced in STB regulations promulgated under 49 U.S.C. § 11323, which set forth rules for obtaining necessary authority for the various types of transactions subject to the statute.  *See* 49 C.F.R. § 1180.2.  The regulations identify four types of transactions: major, significant, minor, and exempt.  *See id.* § 1180.2(a)–(d).  The regulations also specify the information that must be submitted for the Board's review for each type of transaction, with the most extensive information required to be submitted, not surprisingly, for major transactions where the competitive

issues are most important.  *See generally id.* § 1180.6.

Pursuant to the broad deregulatory mandate of the ICA, 49 U.S.C. § 10502, the Board has exempted entire classes of transactions from the otherwise applicable review and approval requirements set forth in the ICA. In doing so, the Board determined that, for those classes of exempt transactions, "prior review and approval of these transactions is not necessary to carry out the rail transportation policy of 49 U.S.C. [§] 10101; and is of limited scope or unnecessary to protect shippers from market abuse."  49 C.F.R. § 1180.2(d).  Because the Board has concluded that prior review and approval are not needed for these classes of "exempt" transactions, information requirements are correspondingly limited.  *See id.* § 1180.4(g).

One such "exempt" class includes "[t]ransactions within a corporate family that do not result in . . . a change in the competitive balance with carriers outside the corporate family."  49 C.F.R. § 1180.2(d)(3).  Corporate reorganizations that do not affect the "competitive balance" with other carriers do not need prior review or approval by the Board because they, by

27

definition, have no significant competitive effects that need to be evaluated. The statutory public interest requirement can be met through a streamlined exemption process because there is no need for a competitive analysis.

NS's argument that it can obtain new control authority through the exemption process is inconsistent with the language of the regulations and with the statute itself. An exemption for corporate family restructuring is only available to the extent the restructuring does not affect the "competitive balance" with other carriers. New control authority affecting competition with other carriers cannot be obtained through the corporate family exemption. When new control authority is sought that affects the "competitive balance" with other carriers, the statute requires that information be submitted to the Board on competitive effects, that the Board review the information, and that the Board expressly authorize the new control authority.

In this case, obtaining control authority over NPBL raises the issue of competitive balance with respect to CSX, another rail carrier. The effect of obtaining control authority over NPBL was never raised before the STB or

analyzed by the STB.  NS never affirmatively sought control authority over

NPBL in any transaction, and the Board has never analyzed the competitive

effects, including the situation presented in the EDVA litigation: access to

Norfolk International Terminals.   Because control authority over NPBL

would affect the "competitive balance" with CSX, NS cannot obtain control

authority over NPBL through the corporate family exemption.

### 2. The Board and the Public Must Have Adequate Notice Before Control Authority is Granted.

In a section of the Board's decision that NS has not challenged on

appeal, the Board stated that "[t]he Board and the public must be able to

clearly understand the control authority sought and granted, particularly

given the significance of the immunity from antitrust laws and other laws

that comes with control authority."   Decision at 11 (JA__).   This is a

commonsense principle: the Board cannot evaluate the competitive effects of

a proposed transaction if the proponents of the transaction do not tell the

Board what the transaction covers.  Similarly, the public and interested

parties cannot comment on a request for control authority or a request for an

exemption if the scope of the transaction is not accurately described.

Here, NS never gave the Board or the public any notice that the 1991 and 1998 transactions were intended to grant it control over NPBL. As stated in the STB Decision, NS's predecessors told the ICC and the public in the 1982 merger that they did not intend to exercise control over non-system companies like NPBL. *See* Decision at 14 (JA__). In the 1991 and 1998 exemption requests, NS and its predecessors never told the ICC, the Board, or the public that they were withdrawing or changing this representation.

Indeed, in the 1991 notice describing why the transaction fell within the class of transactions subject to the corporate family exemption, NS's predecessors did not even identify NPBL. *See* CSX STB Opening, Ex. K, Notice of Exemption (JA__) (hereinafter 1991 SRC Notice of Exemption). Similarly, when NSR invoked a class exemption in 1998, it made no mention of NPBL. CSX STB Opening, Ex. L, Notice of Exemption (JA__) (hereinafter 1998 NSR Notice of Exemption).

Moreover, in describing the scope of control authority sought in 1991, NS's predecessors made it clear that the railroads that were the subject of the 1991 transaction were the same railroads that NS Corp was authorized to

30

control in 1982. In the 1991 request, NS's predecessors stated, "[t]he transaction involves *only rail carrier subsidiaries* of NS Corp *already commonly controlled* and operated as part of a corporate family." 1991 SRC Notice of Exemption at 7 (emphasis added) (JA__). NS does not challenge the Board's conclusion that authority to control NPBL was not granted in 1982. In the 1998 transaction, NSR stated that the goal of the transaction was "corporate simplification" and indicated only that NW would be merged with and into NSR. *See* 1998 NSR Notice of Exemption at 3 (JA__).

This lack of notice dooms NS's argument that the Board and any interested parties had an opportunity to object to the use of the 1991 and 1998 exemptions to obtain control authority over NPBL. *See* NS Opening Br. at 53. There was no reason to believe that NS sought to obtain control authority over NPBL because the exemption notices never indicated that new competitive arrangements were contemplated. NS similarly argues that both the Board and CSX have "long 'acknowledg[ed] and accept[ed] [Norfolk Southern's] majority ownership and control of [Belt Line].'" NS

31

Opening Br. at 4–5.[5]  NS ignores that the Board stated that whether CSX "has acknowledged or accepted that NSC has a right to control NPBL *is irrelevant* to whether the ICC granted NSC authority to control NPBL."  Decision at 17 (emphasis added) (JA__).  What is relevant is that NS never asked for authority to control NPBL and the Board conclusively found that NS was "never granted authority to control NPBL." *Id.* (JA__).  The only lawful way for NS or its predecessors to gain control over NPBL was to follow the ICA and its regulations, which required compliance with the notice, review, and approval procedures.

**C.    The STB's Reasoned Explanation, Interpreting the Regulations, is Neither Arbitrary Nor Capricious.**

NS mounts two arbitrary and capricious challenges to the STB

---

[5] Similarly, NS also asserted that the Board expressed concern that CSX had "seemingly 'understood that [Belt Line] was under the control of [Norfolk Southern].'" NS Opening Br. at 21.  The Board in fact stated its concern as to whether there is a "possibility that *the parties*"—which would include NS, NPBL and CSX—"may have been aware of a potential defect regarding NSR's control of NPBL for some time and did not seek to remedy it or otherwise bring it to the Board's attention."  Decision at 17 n.24 (emphasis added) (JA__).

Decision: (1) the lack of adequate explanation; and (2) improper rulemaking. CSX addresses each in turn below.

### 1.     The STB Provided a Reasoned Explanation.

The STB Decision clearly and adequately explained why the 1991 and 1998 exemptions did not convey control authority over NPBL.  The Board's explanation is consistent with the APA's requirement that, for an action not to be arbitrary and capricious, the agency is required to "adequately explain its result." *Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) (citations omitted).  The Board must "articulate the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision." *Id.* at 88.  Here, the agency described its reasoning, in a manner sufficient to understand the agency's rationale and basis for the Decision.  It was, therefore, not an arbitrary and capricious decision for failure to sufficiently explain.

The Board first explained at length why NS's predecessors did not obtain authority to control NPBL in the 1982 transaction.  The Board explained that in 1982 "petitioners/applicants told the ICC and the public

that they had no intention of controlling the non-system companies [like NPBL] post-transaction….”   Decision at 11 (JA__).   The Board further explained that “[t]he Board and the public must be able to clearly understand the control authority sought and granted, particularly given the significance of the immunity from antitrust laws and other laws that comes with control authority.”  *Id*.

NS nevertheless argued that it could obtain control authority through the 1991 and 1998 exemption requests without making any declaration about its intention to control NPBL or even mentioning the possibility of controlling NPBL.  The Board rejected that position, explaining that “under NSR’s interpretation, the Board and the public might never even know that control authority was granted since, according to NSR, the party seeking the exemption is not required to name the entities over which the exemption would provide the new control authority.”  Decision at 16 (JA__).  The Board did not need to go further in rejecting NS’s attempt to circumvent the Board’s authority by obtaining control over NPBL through stealth.

The extent of the Board's discussion of the issue was justified by the simplicity of the point—parties cannot avoid Board scrutiny of important control arrangements that affect competition by hiding their intentions from the Board and the public.   Moreover, the Board's discussion was commensurate with NS's discussion of the issue in its briefs below.  The 1991 and 1998 transactions were not the focal point of the STB Decision because they were minor points NS raised in support of its primary argument: that the 1982 merger conferred control authority over NPBL.   Below, NS dedicated only a handful of pages to its cursory discussion of the 1991 and 1998 transactions (approximately three pages in its twenty-page STB Opening and five pages in its forty-four-page Reply).

The Court should not countenance NS playing "gotcha" with the Board: focusing entirely on the 1982 merger before the EDVA and never mentioning corporate family transactions; dedicating only a handful of paragraphs to the 1991 and 1998 transactions as ancillary, supporting arguments regarding the 1982 merger; but now arguing that the Board did not adequately address the possibility that the 1991 and 1998 exempt

35

transactions could confer control authority independent of any prior review and grant of control by the Board.  But regardless of NS's brazen litigation tactics, their arguments are simply wrong on the merits, as described above.

> **2.**    **The STB Decision Consistently Applied the Regulations and Did Not Announce a New Rule.**

NS's Opening Brief asserts that the Board's Decision regarding the 1991 and 1998 transactions is inconsistent with the regulation and amounts to an amended or new rule.  That contention misses the point of the corporate family exemption, and rests on an implausible and incorrect interpretation of control authority.

As discussed above, the STB Decision did not create a new rule.  The STB Decision applied the existing corporate family exemption regulation consistent with the plain language of that regulation and the regulatory framework created by the statute.  The corporate family exemption is available only for the reorganization of a corporate structure that does not involve a change in the "competitive balance" with carriers outside the corporate family.  49 C.F.R. § 1180.2(d)(3).  If new control authority is sought that changes the "competitive balance" with other carriers, it must be sought

though a proceeding that provides the Board and the public with information about the potential competitive effects of the transaction. NS could have instituted such a proceeding but did not. This is a straightforward application of the existing regulations involving control authorization. The Board did not create a new rule.

The STB's interpretation of the existing regulatory framework is also entitled to substantial deference. *See supra* pp. 22–24; *Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.*, 194 F.3d 125, 128 (D.C. Cir. 1999) ("An agency's interpretation of its own regulation merits even greater deference than its interpretation of the statute that it administers."). To the extent there is any doubt about the meaning of the regulation, a court must defer to the "agency's interpretation so long as it 'sensibly conforms to the purpose and wording of the regulations.'" *Buffalo Crushed Stone, Inc.*, 194 F.3d at 128 (quoting *Martin v. OSHRC*, 499 U.S. 144, 150–51 (1991)).

In contrast to the STB's interpretation, NS's theory that the Board adopted a new rule rests on an implausible reading of the regulations and statute governing control authorization. NS posits that control authority can

be obtained without asking for it, as NPBL was never listed in the 1991 and 1998 class exemption notices.  As the STB reasonably concluded, control has to be authorized by the Board, and later exemption proceedings used for internal corporate reorganization and restructuring could not and did not result in NS obtaining authority to control NPBL.  The exemption decisions could not have created control authority for the first time because the creation of *new* control authority would have been a "change in the competitive balance with carriers outside the corporate family," for which an exemption was not available.  49 C.F.R. § 1180.2(d)(3).

Consistent with its role, the STB reasonably interpreted its own regulations, applied its substantive expertise, and took the position that 49 C.F.R. § 1180.2(d)(3) requires that a transaction be within a corporate family, and that control over a rail carrier must have been previously granted for that rail carrier to be considered part of the corporate family for purposes of the corporate family exemption.  *See* Decision at 16 (JA__).  It is wholly consistent with the ICA and the langauge of the implementing regulations that corporate family exemptions be used for corporate reorganizations that

38

merely simplify existing control arrangements.  *See* 49 C.F.R. § 1180.2(d)(3).

The theory NS advances in challenging the Board's interpretation of its regulations also leads to absurd results.  As the Board noted, applicants in the 1982 transaction had an ownership interest in "numerous railroad companies in which either NW or SRC held only a small ownership share (as low as 1.78%) and did not control and would not control after the transaction."    Decision at 14 n.22 (JA__).    Under NS's purported interpretation of the governing regulations, a corporate family exemption would automatically confer control authority over those companies, whether or not control authority was previously conferred.  But that would lead to the absurd result that the corporate family exemption allowed NS to control many companies in which NS had miniscule amounts of ownership and over which NS had explicitly disclaimed an intent to control.  The Board sensibly rejected that interpretation of its regulations.

As set forth above, the STB's ruling on the 1991 and 1998 transactions is correct and certainly not arbitrary and capricious.  The STB Decision is a reasonable construction of its own regulations.  It considers and employs its

39

detailed and thorough analysis of the 1982 merger and addresses the many arguments advanced by NS below.  It is consistent with the purpose of the ICA, the plain statutory language, and the text of the regulations implementing the ICA.  In comparison, adopting NS's interpretation would yield incongruous results.  The Board's thorough analysis and its reasoning why control authority was not approved as to NPBL shows precisely how the regulation works, and why a corporate family exemption cannot be used as a back door means to acquire control authority and antitrust immunity.

## CONCLUSION

For the reasons set forth herein and in the Respondents' brief, the petition for review challenging the decision of the Surface Transportation Board should be dismissed for lack of jurisdiction and/or denied.

Dated:  February 13, 2023          Respectfully submitted,

                                   /s/ Benjamin L. Hatch
                                   Benjamin L. Hatch
                                   Robert W. McFarland
                                   Jeanne E. Noonan
                                   MCGUIREWOODS LLP
                                   101 West Main Street, Suite 9000

Norfolk, Virginia 23510-1655
(757) 640-3727
*bhatch@mcguirewoods.com*
*rmcfarland@mcguirewoods.com*
*jnoonan@mcguirewoods.com*

*Counsel for CSX Transportation, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of the U.S. Court of Appeals for the District of Columbia Circuit's Circuit Rule 32(e)(2) because this brief contains 7,274 words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced 14-point Palatino Linotype font using Microsoft Word.

Dated:  February 13, 2023                   */s/ Benjamin L. Hatch*

                                                        *Counsel for CSX Transportation, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2023, the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and the system will serve them.

Dated:  February 13, 2023            */s/ Benjamin L. Hatch*

                                                      *Counsel for CSX Transportation, Inc.*